R. Jeremy Adamson (12818)
Catherine M. Maness (16885)
BUCHALTER
A Professional Corporation
60 E. South Temple, Suite 1200
Salt Lake City, UT 84111
(801) 401-8625
jadamson@buchalter.com
cmaness@buchalter.com

*Attorneys for Mammoth Hockey, LLC*

Gerald W. Griffin (*admitted pro hac vice*)
Leonardo Trivigno (*admitted pro hac vice*)
Meredith Spelman (*admitted pro hac vice*)
Jodutt Basrawi (*admitted pro hac vice*)
Janice J. Kwon (*admitted pro hac vice*)
CARTER LEDYARD & MILBURN LLP
28 Liberty Street
New York, New York 10005
212-238-8610
griffin@clm.com
trivigno@clm.com
spelman@clm.com
basrawi@clm.com
kwon@clm.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UYTE, LLC and SEG HOCKEY, LLC,<br><br>      Plaintiffs,<br><br>vs.<br><br>MAMMOTH HOCKEY, LLC<br><br>      Defendant. | **DEFENDANT MAMMOTH HOCKEY, LLC'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT**<br><br>Case No.: 2:25-cv-00639-DB<br><br>Judge David Barlow |

Pursuant Federal Rule of Civil Procedure 65 and Section 34 of the Lanham Act, 15 U.S.C.

§ 1116, Defendant Mammoth Hockey, LLC, by and through its counsel, submit this Motion for

Preliminary Injunction and Opening Brief in Support, along with the declarations of Erik Olson

and Gerald W. Griffin, and accompanying exhibits. Defendant seeks to preliminarily enjoin

Plaintiffs SEG Hockey, LLC and Uyte, LLC from marketing and selling hockey-related goods,

apparel and accessories, including hockey bags, bearing the mark UTAH MAMMOTH and

accompanying logo of a mammoth's head in forty-seven states, including Utah, on the grounds that Plaintiffs' use of such marks infringe Defendant's trademarks. Defendant is likely to succeed on the merits of their claims, and the other preliminary injunction factors likewise counsel in favor of granting Defendant's motion.

Defendant also respectfully requests a hearing on this motion.

Date: September 25, 2025

|  | /s/ Gerald. W. Griffin |
|---|---|
| R. Jeremy Adamson (12818) | Gerald W. Griffin (*admitted pro hac vice*) |
| Catherine M. Maness (16885) | Leonardo Trivigno (*admitted pro hac vice*) |
| BUCHALTER | Meredith Spelman (*admitted pro hac vice*) |
| A Professional Corporation | Jodutt Basrawi (*admitted pro hac vice*) |
| 60 E. South Temple, Suite 1200 | Janice J. Kwon (*admitted pro hac vice*) |
| Salt Lake City, Utah 84111 | CARTER LEDYARD & MILBURN LLP |
| (801) 401-8625 | 28 Liberty Street, 41st Floor |
| jadamson@buchalter.com | New York, New York 10005 |
| cmaness@buchalter.com | 212-238-8610 |
|  | griffin@clm.com |
|  | trivigno@clm.com |
|  | spelman@clm.com |
|  | basrawi@clm.com |
|  | kwon@clm.com |

*Attorneys for Mammoth Hockey, LLC*

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 5

      A.  Defendant Owns the Mark and Logo ........................................................... 5

      B.  Plaintiffs' Failed Attempts to Change Their Team's Name ........................... 7

      C.  Plaintiffs Take Defendant's Mark ............................................................... 8

      D.  Defendant Demands Plaintiffs Cease and Desist Their Use of Its Mark .................. 11

III.  ARGUMENT ................................................................................................ 12

      A.  Defendant Is Likely to Succeed on its Claims of Trademark Infringement .............. 12

           1.  Defendant Owns a Protectible Trademark ........................................... 12

           2.  Plaintiffs Use an Identical or Similar Mark ........................................ 14

           3.  Plaintiffs' Use of the Accused Mark Causes a Likelihood of Confusion By
               Consumers ................................................................................ 14

      B.  Defendant Will Suffer Irreparable Harm if an Injunction is Not Granted ................ 24

      C.  The Irreparable Harm to Defendant Outweighs Any Harm to Plaintiffs .................. 25

      D.  An Injunction Will Not Adversely Affect the Public Interest ...................... 25

IV.   CONCLUSION ................................................................................................ 26

# TABLE OF AUTHORITIES

## Cases

*1-800 Contacts, Inc. v. Lens.Com, Inc.*,
    722 F.3d 1229 (10th Cir. 2013) .................................................................................. 14

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000) ...................................................................................... 16

*Altira Group LLC v. Philip Morris Cos.*,
    207 F. Supp. 2d 1193 (D. Colo. 2002) ................................................................. 15, 17

*Bad Ass Coffee v. JH Nterprises, L.L.C.*,
    636 F. Supp. 2d 1237 (D. Utah 2009) ........................................................................ 25

*Basis Int'l Ltd. v. Research in Motion Ltd.*,
    827 F. Supp. 2d 1302 (D.N.M. 2011) ......................................................................... 21

*Big O Tire Dealers, Inc., v. Goodyear Tire & Rubber Co.*,
    561 F.2d 1365 (10th Cir. 1977) .................................................................................... 3

*Collectable Promotional Prods. v. Disney Enters.*,
    No. CIV-06-1187-D, 2009 U.S. Dist. LEXIS 46775 (D. Okla. 2009) ....................................... 15

*Donchez v. Coors Brewing Co.*,
    392 F.3d 1211 (10th Cir. 2004) ..................................................................... 13, 14, 21

*Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*,
    434 F. Supp. 3d 1227 (D. Utah 2020) ............................................................ 12, 15, 16, 17

*Fisons Horticulture, Inc. v. Vigoro Indus.*,
    30 F.3d 466 (3d Cir. 1994) ............................................................................... passim

*GTE Corp. v. Williams*,
    904 F.2d 536 (10th Cir. 1990) .................................................................................... 22

*Harris Research, Inc. v. Lydon*,
    505 F. Supp. 2d 1161 (D. Utah 2007) ........................................................................ 25

*Instructure, Inc. v. Canvas Techs., Inc.*,
    No. 2:21-CV-00454-DAK-CMR, 2022 U.S. Dist. LEXIS 2822 (D. Utah 2022) .............. passim

*Kelly-Brown v. Winfrey*,
   717 F.3d 295 (2d Cir. 2013) ................................................................................ 18

*Marketquest Group, Inc. v. BIC Corp.*,
   862 F.3d 927 (9th Cir. 2017) ............................................................................... 17

*Sally Beauty Co., Inc. v. Beautyco, Inc.*,
   304 F.3d 964 (10th Cir. 2002) ............................................................... 14, 16, 20, 21

*Sara Lee Corp. v. Sycamore Family Bakery*,
   No. 2:09CV523DAK, 2009 U.S. Dist. LEXIS 100554 (D. Utah Oct. 27, 2009) ..................... 15

*Sec. USA Servs., LLC v. Invariant Corp.*,
   No. 1:20-cv-01100-KWR-KRS, 2023 U.S. Dist. LEXIS 46962 (D.N.M. 2023) ......... 13, 20, 25

*Underwood v. Bank of Am. Corp.*,
   996 F.3d 1038 (10th Cir. 2021) ........................................................................ 12, 13

*Wreal, LLC v. Amazon.com, Inc.*,
   38 F.4th 114 (11th Cir. 2022) .......................................................................... 18, 21

**Statutes**

15 U.S.C. § 1116(a) ................................................................................................ 24

15 U.S.C. § 1125 ................................................................................................... 12

Defendant Mammoth Hockey LLC ("Defendant") respectfully submits this memorandum of law in support of its motion for an order pursuant to Fed. R. Civ. P. 65 and 15 U.S.C. § 1116, preliminarily enjoining Plaintiffs SEG Hockey, LLC and Uyte, LLC (the "Plaintiffs") from marketing and selling hockey-related goods, apparel and accessories, including hockey bags, bearing the mark UTAH MAMMOTH (or the "Accused Mark") and accompanying logo of a mammoth's head (the "Accused Logo") in forty-seven states, including Utah (the "Motion.").[1]

## I.  INTRODUCTION

Since 2014, Defendant has manufactured and sold hockey-related goods bearing the mark "MAMMOTH HOCKEY" (or the "Mark") and an accompanying logo of a mammoth's head (the "Logo"). Defendant is particularly well known for its highly durable hockey bags, which have received excellent reviews from prominent figures in the hockey community. While the Mark and Logo are not registered with the United States Patent and Trademark Office ("USPTO"), Defendant was the first to commercially use them eleven years ago and continues to use them today. Defendant's first and continued commercial use of the Mark and Logo establishes its common law trademark rights to MAMMOTH HOCKEY in forty-seven states, including Utah.

Plaintiffs are the owners of the new National Hockey League ("NHL") team in Utah, which entered the NHL last season under the name "Utah Hockey Club." Plaintiffs announced before last season that they would change their team's name before the upcoming season, and that their fans would decide the team's new name by voting on twenty options. In April and May 2024, Plaintiffs applied to the USPTO for the trademark rights to all twenty names, including UTAH MAMMOTH,

---

[1] The declarations of Erik Olson ("Olson Decl.") dated September 25, 2025, and Gerald W. Griffin ("Griffin Decl.") dated September 25, 2025, are also submitted in support of the Motion.

and opened voting to the fans. But Plaintiffs did so without knowing whether the twenty names were existing protectible trademarks under federal and common law.

Indeed, by January 2025, the USPTO had systematically rejected Plaintiffs' applications for trademarks on many of the team's potential new names because of their likelihood of confusion with existing registered trademarks, including fan-favorite UTAH YETI. As a result, Plaintiffs engaged "extensively" with Yeti Holdings, Inc. ("Yeti"), the maker of highly durable coolers, to negotiate their use of the YETI mark, but to no avail. On January 29, 2025, Plaintiffs finally "moved on" from YETI because merchandise bearing the team's new name had to be "ready to go" when they announced the team's new name before the NHL season. Plaintiffs quickly reopened fan voting on three remaining names, including UTAH MAMMOTH. Again, Plaintiffs did so without knowing whether the Accused Mark was an existing trademark under common law.

In February 2025, seven months before the start of the season, Plaintiffs made inquiries about MAMMOTH HOCKEY to a professional hockey player who had sponsored Defendant when it launched its Mark and Logo in 2014. At least by then, Plaintiffs knew of Defendant's Mark and Logo and its commercial use of them for over a decade. Plaintiffs, however, never contacted Defendant like they did Yeti. Plaintiffs never attempted to negotiate an agreement for their use of the Mark and Logo like they did Yeti. Instead, Plaintiffs hid their intentions to use the Mark and Logo from Defendant because they had already decided to take them in time for the NHL season.

Indeed, in April 2025, five months before the start of the season, and having not heard from Plaintiffs, Defendant contacted Plaintiffs to inquire about their intentions of using the Mark. Plaintiffs falsely responded that they had not yet decided on the team's new name but would consider a "partnership" with Defendant if they ultimately chose the Accused Mark. Five days

later, Plaintiffs leaked they had decided to rename the team UTAH MAMMOTH. One week later, and four months before the start of the season, Plaintiffs officially announced the Accused Mark and Logo as their team's new name and logo.

On the same day as their announcement, Plaintiffs opened their only physical store at the Delta Center in Salt Lake City, Utah so that fans could purchase merchandise bearing the Accused Mark and Logo. Plaintiffs admit that it took an "Ice Age worth of time" to make the vast selection of merchandise bearing the Accused Mark and Logo available to their fans. Plaintiffs also mounted signs and banners bearing the Accused Mark and Logo around the arena to market the team's new name and logo. Plaintiffs then flooded the market with merchandise bearing the Accused Mark and Logo, including cheaply made hockey bags, primarily through internet advertising and online sales. Other than their lone physical location at the Delta Center, Plaintiffs have not physically entered another state with their Accused Mark and Logo.

Plaintiffs' conduct is a classic example of trademark infringement by "reverse confusion." Reverse confusion occurs when a larger, more powerful "junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 474-475 (3d Cir. 1994); *see also Big O Tire Dealers, Inc., v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372 (10th Cir. 1977).

Defendant is likely to succeed on its infringement claim against Plaintiffs. Defendant has protectible trademark rights to MAMMOTH HOCKEY and the Logo through its first and

continued commercial use of the Mark and Logo in forty-seven states, except for Hawaii, Mississippi, and North Dakota. Plaintiffs have no similar trademark rights to UTAH MAMMOTH and the Accused Logo. The marks are confusingly similar given the dominant term, "MAMMOTH," is the same in both marks, and the parties use the marks to sell the same hockey-related goods in the same channels of trade to the same consumers. The parties also use the marks with confusingly similar logos of a mammoth's head. Plaintiffs have saturated the market with the Accused Mark and Logo, causing consumers to mistakenly believe Defendant's goods, including its highly durable hockey bags, are associated with Plaintiffs' hockey team and hockey-related goods, including their cheaply made hockey bags.

Plaintiffs did so in bad faith knowing that Defendant has used the Mark and Logo for the past eleven years. Despite their knowledge, Plaintiffs never spoke to Defendant about its Mark and Logo before using the Accused Mark and Logo. Plaintiffs simply ignored Defendant's well-established trademark rights by saturating the market with their merchandise. Plaintiffs were apparently more concerned about renaming their team pursuant to the fans' vote as they promised them and then having enough merchandise ready to sell fans when they did. But Plaintiffs disregarded the obvious confusion and harm saturating the market would cause consumers and Defendant. Evidently, Plaintiffs deemed Defendant too small to protect its Mark and Logo, and Plaintiffs just took them. Plaintiffs now ask this Court to help them complete their theft.

Because the Defendant is likely to succeed on its claim of infringement, irreparable harm is presumed under the Trademark Modernization Act. Irreparable harm is also established under reverse confusion case law. Because Plaintiffs saturated the market with merchandise bearing the Accused Mark and Logo, Defendant will continue to lose value in its Mark and Logo, its product

identity, control over its goodwill and reputation, and its ability to expand into new markets. Consumers will mistakenly believe Defendant's hockey-related goods, including its hockey bags, are connected to Plaintiffs' hockey team. Fans who support another team will not purchase Defendant's goods due to their mistaken belief that they would be supporting their team's rivals. Such confusion is inherently contrary to the public interest.

Because Defendant is likely to succeed on its claim of infringement, and is irreparably harmed by Plaintiffs' conduct, which has causes public confusion as to the source of Defendant's goods, Defendant is entitled to a preliminary injunction prohibiting Plaintiffs from marketing and selling its hockey-related goods bearing the Accused Mark and Logo.

## II. BACKGROUND

### A. __Defendant Owns the Mark and Logo__

Defendant is a small business in Portland, Oregon that manufactures and sells hockey-related goods, including highly durable hockey bags. Olson Decl. at ¶¶ 2-7. Defendant was formed in 2014 by two hockey enthusiasts who recognized the need for better quality hockey equipment. *Id*. Defendant's hockey bags are designed to survive years of intense use under extreme conditions: they are made of heavy-duty resilient materials, including 18-ounce truck tarp, silver pack cloth lining, seatbelt shoulder straps, and brass zippers with red paracord pulls. *Id*. at ¶¶ 8-35.

Defendant manufactures, markets and sells its products bearing the Mark and Logo in forty-seven states, except for Hawaii, Mississippi, and North Dakota, and in Canada. *Id.* at ¶ 35. Defendant chose "MAMMOTH" because it signifies strength, endurance and resilience due to the Ice Age animal's size and ability to survive harsh conditions, which aptly describes Defendant's highly durable hockey bags. *Id*. at ¶ 6.

  

Defendant has sold its hockey-related products on its website for eleven years, which provides details of their pricing and specifications, as well as videos demonstrating their use. *Id*. at ¶ 23. The website has been fully active since 2014 and has received hundreds of thousands of views. *Id*. Indeed, prior to Plaintiffs' saturation of the market with the Accused Mark and Logo, an internet search for "mammoth hockey bags" would lead first to Defendant's website. *Id*. at ¶ 24. Defendant intends to expand its sales channels in the future by, among other things, selling wholesale to brick-and-mortar hockey stores and to large internet retailers. *Id*. at ¶ 58.

Defendant also maintains social accounts on Instagram, Facebook and You Tube, which feature Defendant's products and demonstration videos. *Id.* at ¶¶ 37-39. Defendant also actively promotes its business in the national and international hockey community by, among other things, sponsoring various hockey teams and tournaments in multiple locations, including in Oregon, Washington, Minnesota and Canada, where they distribute coupons, stickers, hats and postcards bearing the Defendant's Mark and Logo. *Id*. at ¶ 40-41.

    

Defendant's highly durable hockey bags have received excellent reviews from prominent figures in the hockey community, which have also been viewed by hundreds of thousands of

people. *Id.* at ¶ 43. For example, Jeremy Rupke of the "Coach Jeremy" YouTube account stated that Defendant's hockey bags are "definitely the best bags [he's] seen quality-wise on the market." *Id*. Chris Kibui of Hockey Tutorial stated that they are "the last hockey bag you'd ever need to buy." *Id*. Hockey World Blog reported that their "quality of materials, the craftsmanship, and the attention to detail are all prevalent." *Id*.

## B. Plaintiffs' Failed Attempts to Change Their Team's Name

In April 2024, Plaintiffs purchased the NHL hockey team formerly known as the "Arizona Coyotes" for $1.2 Billion and relocated the team to Utah. Griffin Decl. at ¶ 3. The team played its first season under the temporary name UTAH HOCKEY CLUB. *Id*. After purchasing the team, Plaintiffs announced that the fans would decide the team's permanent name by voting on twenty options. *Id*. In April and May 2024, Plaintiffs filed trademark applications with the USPTO for all twenty names, including UTAH MAMMOTH and the Accused Logo. *Id*. In June 2024, Plaintiffs announced six finalists based on the fan's initial voting: UTAH YETI, UTAH MAMMOTH, UTAH BLIZZARD, UTAH VENOM, UTAH OUTLAWS and UTAH HOCKEY CLUB. *Id*. UTAH YETI was reported to be the fan favorite. *Id*.

On January 9 and 16, 2025, the USPTO rejected Plaintiffs' applications for three of the six finalists, including UTAH YETI, because of their likely confusion with existing registered trademarks. Griffin Decl. at ¶ 11. With respect to UTAH YETI, the USPTO found that YETI was the dominant element of the mark, and thus "essentially identical in sound, appearance, meaning, and commercial impression" to Yeti's registered trademarks. *Id*. The USPTO stated, "[b]ecause the marks are confusingly similar and refer to closely related goods, consumers would be likely to mistakenly believe that the goods emanate from a single source." *Id*. The USPTO also found

UTAH BLIZZARD and UTAH VENOM confusingly similar to other registered trademarks for similar reasons. Plaintiffs did not challenge the USPTO's rejections of those applications, which resulted in their abandonment. *Id.*

Instead, Plaintiffs engaged "extensively" with Yeti to negotiate their use of UTAH YETI but failed to reach an agreement. Griffin Decl. at ¶ 14. After speaking with Yeti, Plaintiffs acknowledged Yeti's "unique and strong trademark on anything published Yeti or Yetis." *Id.* On January 29, 2025, Plaintiffs reported they had "moved on" from Yeti because they could not agree on Plaintiffs' use of Yeti's mark on their team's merchandise, which had to be "ready to go" when they announced the team's new name before the upcoming season. *Id.* Plaintiffs' corporate representative explained:

> The name of the team is one thing, but it's all of the merch, all of the clothing, the pucks and the mini sticks and all of those things. It's a little hard to launch a brand if you don't have all of that stuff ready to go … Because Yeti coolers determined that they did not want to enter into a co-existence agreement, it put those things on hold and we decided to move on from the name Yeti.

*Id.* Plaintiffs then reopened fan voting to the three remaining names: UTAH MAMMOTH, UTAH OUTLAWS and UTAH HOCKEY CLUB. *Id.* Notwithstanding the major "roadblocks" to their trademark applications, Plaintiffs insisted in January that they were "fully on track with [their] plans to announce a permanent name and identity ahead of the 2025-26 NHL season." *Id.*

## C. <u>Plaintiffs Take Defendant's Mark and Logo</u>

By February 2025, Plaintiffs had only seven months to select a new name and prepare its merchandise before the start of the NHL season. Griffin Decl. at ¶ 18. On February 13, 2025, Plaintiffs' corporate representative reached out to a professional hockey player named Mike Lundin, who had sponsored Defendant when it launched its Mark and Logo in 2014. Olson Decl.

at ¶ 45. Plaintiffs representative asked Mr. Lundin about Defendant, its owners, and how they could

contact them. *Id*. At least by then, Plaintiffs knew of Defendant's use of the Mark and Logo for the

past eleven years. Despite that knowledge, Plaintiffs never contacted Defendant. *Id*.

Having not heard from Plaintiffs, on April 14, 2025, Defendant's co-owner, Erik Olson,

contacted Plaintiffs' representative to inquire about Plaintiffs' intentions to use the Mark:

> Hi Rachel, I'm Erik Olson, co-founder of Mammoth Hockey here in Portland,
> Oregon. I had heard through the grapevine you were asking around about our
> hockey bag company. If the Utah Hockey Club ends up being the Mammoth next
> season (I understand you can't divulge) then it would be cool to talk about a
> possible collaboration.

Olson Decl. at ¶ 46. Mr. Olson intended his message to educate Plaintiffs about Defendant's

business after Plaintiffs had inquired about its Mark. In good faith, Mr. Olson offered to discuss

Plaintiffs' use of the Mark if they ultimately chose the Accused Mark as the team's new name. *Id*.

Mr. Olson had no intention of relinquishing the Mark and Logo to Plaintiffs having spent the past

decade building the Mark and Logo for his business. *Id*. Indeed, Defendant would not have a

business without its Mark and Logo. *Id*. Ten days later, on April 24, 2025, Plaintiffs' corporate

representative responded to Mr. Olson falsely stating:

> Hi Erik, I had a chance to speak with [the President] and he said they have not
> reached any determinations yet but will definitely keep this partnership in mind
> should things end up moving in that direction.

Olson Decl. at ¶ 47.

Five days later, on April 30, 2025, Plaintiffs leaked they had already decided to rename the

team UTAH MAMMOTH. Griffin Decl. at ¶ 19. One week later, on May 7, 2025, Plaintiffs

officially announced the team's new name. *Id*. On the same day, Plaintiffs opened their only

physical store at the Delta Center so fans could purchase a wide variety of merchandise all bearing

the Accused Mark and Logo. *Id*. Plaintiffs' corporate representative explained that it took an "Ice Age worth of time" to have the vast selection of merchandise available for their fans. *Id*. Plaintiffs also mounted signs and banners around the arena to market the Accused Mark and Logo.

 

Plaintiffs then flooded the market with merchandise, including hockey bags, bearing the Accused Mark and Logo, through internet advertising and online sales. Griffin Decl. at ¶¶ 21-25. Indeed, an internet search for "mammoth hockey" now leads first to Plaintiffs' websites. A more particular search for "mammoth hockey bags" leads first to Plaintiffs' sponsored advertisements for purchase of their cheaply made hockey bags from numerous online sources. *Id*. Defendant's website follows, giving the false impression that the two companies are connected. *Id*.

  

Also on May 7, 2025, the USPTO rejected Plaintiffs' application for UTAH MAMMOTH finding the "UTAH" portion of the mark merely geographically descriptive of the region. Griffin Decl. at ¶ 23. The USPTO required Plaintiffs to disclaim "UTAH", leaving "MAMMOTH" as the single dominant term of the Accused Mark. *Id*. Plaintiffs have challenged the USPTO's rejection, and thus Plaintiffs' application for the Accused Mark is still pending. *Id*. As of today, the USPTO

has not granted any of Plaintiffs' twenty trademark applications except for its application for "UTAH HOCKEY CLUB", the team's previous name until four months ago. *Id*.

### D. **Defendant Demands Plaintiffs Cease and Desist Their Use of Its Mark**

On June 10, 2025, Defendant's counsel wrote to Plaintiffs and explained Defendant's prior use of the Mark and Logo and how the Accused Mark would confuse consumers into thinking that Defendant was associated with Plaintiffs' team. Griffin Decl. at ¶ 27. Counsel advised Plaintiffs that their activities may constitute trademark infringement under the Lanham Act (as well as under common law). *Id*. Counsel demanded, among other things, that Plaintiffs immediately cease and desist from all use of the Accused Mark and Logo. *Id*.

On June 23, 2025, Plaintiffs responded, confirming that Plaintiffs knew of Defendants' Mark and Logo, but were confident they did not infringe Defendant's trademark rights. Griffin Decl. at ¶ 28. Plaintiffs made clear they had no intention of speaking with Defendant about their use of the Mark and Logo stating:

> Please note that while Utah Mammoth is always interested in discussing opportunities with reputable parties interested in genuine collaboration, it has little desire to engage entities who pursue unfounded claims.

Dkt. No. 2, Ex. B at 1. Plaintiffs preferred to litigate. On July 31, 2025, Defendant's counsel explained again Defendant's trademark rights to the Mark and Logo and asked Plaintiff's counsel if they would accept service of a complaint for infringement. *Id*. Plaintiffs responded the next day by filing the complaint in this action, which they had "ready to go" as part of their strategy to take the Mark and Logo from Defendant. *Id*.

## III. ARGUMENT

A preliminary injunction is appropriate if the moving party establishes "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm …; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Instructure, Inc. v. Canvas Techs., Inc.*, No. 2:21-CV-00454-DAK-CMR, 2022 U.S. Dist. LEXIS 2822, *27 (D. Utah 2022). Defendant establishes all four elements.

### A. Defendant Is Likely to Succeed on its Claims of Trademark Infringement

Defendant has asserted claims against Plaintiffs for, among other things, trademark infringement under Section 43 of the Lanham Act (15 U.S.C. § 1125). Dkt. No. 25. To succeed on its claim for trademark infringement, Defendant must demonstrate: (1) it has a protectable mark; (2) Plaintiffs have used an identical or similar mark in commerce; and (3) Plaintiffs' use of the mark creates a likelihood of confusion by consumers. *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239 n.60 (D. Utah 2020). "Of these factors, 'the central inquiry' is the likelihood of consumer confusion." *Id. at* 1239-40.

#### 1. Defendant Owns a Protectible Trademark

Unregistered marks are protected by Section 43(a) of the Lanham Act and can also be enforced under state and common law. *Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1045 (10th Cir. 2021). "'The basic rule of trademark ownership in the United States is priority of use,' which occurs through 'use of a symbol to identify the goods or services of one seller and distinguish them from those offered by others.'" *Id.* "'[S]o long as a person is the first to use a particular mark,' that person will prevail against subsequent users of the mark." *Id.*

Among other things, a plaintiff may establish a protectable interest through "actual use" of a mark in the market, which consists of "attempt[s] to complete genuine commercial transactions." *Id.* at 1053-54. Notably, to establish actual use, "the extent or duration of use is of no particular significance other than to the extent that it demonstrates [an] intention to adopt." *Id.* at 1054. Even "a single use in trade may sustain trademarks rights if followed by continuous commercial utilization." *Id*. A website that bears a trademark may also constitute actual "bona fide use in commerce," where the website "identif[ies] [the] goods or services [the owner] could have provided through or in connection with the website." *Id*.

Here, it is beyond dispute that Defendant has used the Mark and Logo for the past eleven years and in forty-seven states, except for Hawaii, Mississippi, and North Dakota, well before the Plaintiffs began using the Accused Mark four months ago. Olson Decl. ¶ 35. Throughout those eleven years, Defendant's website has openly displayed the Mark and Logo and offered for sale Defendant's hockey-related goods, including its highly durable hockey bags, bearing those marks. *Id*. at ¶ 23. Defendant's continuous use of the Mark far exceeds "even a *single use* in trade" and therefore is more than sufficient to sustain Defendant's common law trademark rights to the Mark and Logo in those states. *Underwood,* 996 F.3d at 1054; *see also Sec. USA Servs., LLC v. Invariant Corp.*, No. 1:20-cv-01100-KWR-KRS, 2023 U.S. Dist. LEXIS 46962, *9 (D.N.M. 2023) (finding Defendants used the trademark well before Plaintiff and thus the rightful owner of the mark).

Defendant's Mark and Logo are entitled to the greatest degree of protection. Marks are given varying degrees of protection depending on whether they are generic, descriptive, suggestive, arbitrary, or fanciful. *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004). Arbitrary marks deserve the greatest protection because they apply "common words … in

unfamiliar ways." *Id*. Defendant's Mark is arbitrary because it applies the common word "mammoth" to hockey-related goods. The word "mammoth" bears no relationship to hockey. A mammoth playing hockey is nonsensical. Defendant's Mark and Logo are therefore entitled to the greatest protection. *See Instructure,* 2022 U.S. Dist. LEXIS 2822, *42 (finding mark arbitrary because it bears no relationship to the actual products).

    2.  <u>Plaintiffs Use an Identical or Similar Mark</u>

For the past four months, Plaintiffs have used the identical or similar Accused Mark and Logo. Plaintiffs admit that they use the Accused Mark and Logo "extensively to market, offer, advertise and promote goods" – including hockey bags – which are "widely sold online through authorized retailers, as well as through the team's [only physical] store located in the Delta Center in Salt Lake City, Utah and the NHL's online store." Dkt. No. 2 at ¶¶ 2, 17-21, 30.

    3.  <u>Plaintiffs' Use of the Accused Mark Causes a Likelihood of Confusion by Consumers</u>

The Tenth Circuit considers six factors for determining likelihood of confusion: "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002)).

There are two main types of confusion by consumers. Forward confusion occurs when consumers "develop the mistaken belief that the plaintiff is the origin of the defendant's goods or services—so that the defendant capitalizes on the plaintiff's good name." *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1238-1239 (10th Cir. 2013). Reverse confusion occurs:

    when a [defendant] saturates the market with a trademark similar or identical to that of a smaller, [plaintiff]. In such case, the [defendant] does not seek to profit from

> the good will associated with the [plaintiff's] mark. Nonetheless, the [plaintiff] is injured because the public comes to assume that the [plaintiff's] products are really the [defendant's] or that the former has become somehow connected to the latter. The result is that the [plaintiff] loses the value of the trademark - its product identity, corporate identity, control over its good will and reputation, and ability to move into new markets.

*Altira Group LLC v. Philip Morris Cos.*, 207 F. Supp. 2d 1193, 1197 (D. Colo. 2002); *see also Big O Tire Dealers,* 561 F.2d at 1365 (reverse confusion occurs where "infringer's use of plaintiff's mark results in confusion as to origin of plaintiff's product"); *Fisons*, 30 F.3d at 472 (same). Here, Defendant asserts reverse confusion, and accordingly, some of the "likelihood of confusion" factors will differ from a traditional forward confusion analysis. *Collectable Promotional Prods. v. Disney Enters.*, No. CIV-06-1187-D, 2009 U.S. Dist. LEXIS 46775,  *36 (D. Okla. 2009).

   a)  *The Accused Mark Logo Are Extremely Similar to Defendant's Mark and Logo*

The similarity of the marks is tested on three levels as encountered in the marketplace: sight, sound, and meaning. *Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1246. Here, the dominant and distinctive portions of the Accused Mark and Logo and Mark and Logo are nearly identical: 1) the word "MAMMOTH," in all capital letters, and 2) a logo of a mammoth's head. In Defendant's Mark, the word "HOCKEY" is merely descriptive of the type of goods sold. Griffin Decl., Ex. 22 at pp. 3-4; see also *Sara Lee Corp. v. Sycamore Family Bakery*, No. 2:09CV523DAK, 2009 U.S. Dist. LEXIS 100554 (D. Utah Oct. 27, 2009) (finding the word "Bakery" had nominal commercial significance). In the Accused Mark, "UTAH" is merely descriptive of the origin of the goods sold. Griffin Decl. Ex. 22 at p. 2. Because both marks consist of the identical and dominant word MAMMOTH, "consumers are unlikely to divine significant differences in the marks' meanings." *Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1247.

15

Furthermore, both parties' marks are accompanied by logos featuring powerful mammoth heads. While Plaintiffs may assert that the orientation of the logos differ – Defendants' mammoth head is viewed front-on and Plaintiffs' head from a profile – the test is not whether the logos are identical when viewed side-by-side, but rather whether they "confuse the public when singly presented." *Sally Beauty Co.*, 304 F.3d at 972.

     

Thus, as to sight, the visual components of the marks and logos are so similar they are likely to cause confusion. *Instructure, Inc.*, 2022 U.S. Dist. LEXIS 2822, *35 (finding identical marks with some slight differences in accompanying logos similar and likely to confuse); *Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1246 (same). As to sound, the identical word "MAMMOTH" is pronounced in the exact same way. Finally, as to "meaning", the marks and logos create the same overall impression by bringing the strength, endurance and resiliency of a mammoth to the sport of hockey and hockey-related goods, including hockey bags. Olson Decl. ¶ 6. The similarity between the marks is therefore extremely high.

The similarity of the marks is the most important and often dispositive factor of likelihood of confusion where the parties sell their goods indirect competition with one another. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 214 (3d Cir. 2000) ("a district judge should feel free to consider only the similarity of the marks themselves."); *Fisons*, 30 F.3d at 472-473 ("the court need rarely look beyond the mark itself."); *Sally Beauty Co.*, 304 F.3d at 972 ("similarities are weighed more heavily than differences"). Here, the parties sell hockey-related

goods to hockey fans through online sales in direct competition with one another. Fans will naturally associate MAMMOTH HOCKEY with Plaintiffs' NHL hockey team as they would "Yankees Baseball", "Cowboys Football" and "Celtic Basketball" with those teams. Fans of other teams will forego purchase of Defendant's bags mistakenly thinking they would be supporting Plaintiffs' hockey team. The similarity of the marks strongly favors likelihood of confusion.

### b) Plaintiffs Took the Mark and Logo in Bad Faith

In reverse confusion cases, "the appropriate intent inquiry is whether defendant acted *carelessly* or *otherwise culpably* in selecting the allegedly infringing name." *Altira Group LLC*, 207 F. Supp. 2d at 1200 (emphasis added); *see also Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1247 n. 122. The requisite intent can be shown by a wide variety of conduct:

> At one extreme, intent could be shown through evidence that a defendant deliberately intended to push the plaintiff out of the market by flooding the market with advertising to create reverse confusion. Intent could also be shown by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the [mark], failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion.

*Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 934-935 (9th Cir. 2017). Thus, Defendants adopt a mark in bad faith when they fail to "conduct[ ] an adequate … search for other companies marketing similar goods under [a similar mark]" or fail to "follow[ ] through with its investigation when [they find] such companies." *Fisons*, 30 F.3d at 480.

In reverse confusion cases, the proper inquiry is whether defendants "consider the likelihood of confusion with other companies' marks and products (as opposed to considering the likelihood that someone would contest its new mark)." *Id*. Defendants are "careless in their evaluation of the likelihood of confusion" when they fail to even "attempt to contact companies using a similar mark." *Id*.; *see also Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 136 (11th Cir.

2022) (finding defendant's knowledge of plaintiff's mark, intent to swamp the market with its product, and that both products appeared attributable to a single source, weighed heavily against good faith); *Kelly-Brown v. Winfrey*, 717 F.3d 295, 313 (2d Cir. 2013) (finding culpability alleged where defendants "had knowledge of [the] mark, liked it, and decided to use it as their own.").

Here, Plaintiffs saturated the market with the Accused Mark and Logo knowing that Defendant has used its Mark and Logo for the past eleven years. Despite their knowledge, Plaintiffs never contacted Defendant about the Mark.[2] Indeed, Plaintiffs concealed their intent to use the Mark when Defendant contacted them, falsely stating they had not chosen a team name only to saturate the market days later. By doing so, Plaintiffs ignored the obvious confusion and harm it would cause the public and Defendant. Plaintiffs were more concerned about renaming their NHL team pursuant to their fans' vote before the start of the season and then having enough merchandise ready to sell them when they did. Plaintiffs deemed Defendant too small to protect its Mark and Logo, liked them, and just took them. Plaintiffs' theft of the Mark and Logo is the definition of bad faith in reverse confusion cases. *See Fisons*, 30 F.3d at 480; *Kelly-Brown*, 717 F.3d at 313.

Plaintiffs' bad faith is further demonstrated by their continued use of the Accused Mark and Logo after Defendant's cease and desist letter. Indeed, after admitting they knew about the Mark, Plaintiffs claimed they did not infringe because the Accused Mark was different in appearance having "UTAH," not "HOCKEY," and the parties' sold different goods through different sales channels. But the USPTO had already told them that the dominant portion of the

---

[2] Plaintiffs' failure to follow through with its investigation of the Mark is further supported by the number of trademark applications they submitted to the USPTO, but which were rejected *because* of their likelihood of confusion with existing registered trademarks. *See* Griffin Decl. ¶ 13.

Accused Mark was "MAMMOTH", and that "UTAH" and "HOCKEY" were merely descriptive of region and the type of goods sold. Griffin Decl. ¶ 23, Ex. 22. Plaintiffs of course knew they were selling the same hockey-related goods, including hockey bags, to hockey fans through online sales, just like Defendant. *See Instructure, Inc.*, Inc., 2022 U.S. Dist. LEXIS 2822, *36-37 (finding culpable intent from knowledge of the mark, use after cease-and-desist letter, and further steps to ensure use). Plaintiffs' bad faith strongly favors likelihood of confusion.

> c) *Plaintiffs Use of the Accused Mark and Logo Has Caused Actual Confusion*

Prior to Plaintiffs' use of the Accused Mark and Logo, an internet search for "mammoth hockey bags" would yield as its first result Defendant's website, where it has marketed and sold its hockey-related goods bearing the Mark and Logo since 2014. Olson Decl. at ¶ 24. However, since Plaintiffs saturated the market, the first results that now appear for the same search are "Sponsored" advertisements for five different websites, from which customers can purchase *Plaintiffs'* cheap hockey bags bearing the Accused Mark and Logo, including the NHL's online store. Defendant's website follows, giving the false impression that the companies and their goods are connected. Griffin Decl. at ¶ 24. Although it has only been four months since Plaintiffs announced the team's new name, members of the public are already confused:

> The fact that I have to use extra descriptors when I'm trying to differentiate between Mammoth Hockey (bag) and Utah Mammoth Hockey Club (NHL), kind of demonstrates the exact problem. This isn't just someone using the same creature in different contexts, it's very overlapping. What are the odds that the NHL team will use slogans, chants, or nicknames like "Mammoth Hockey" or "That's Mammoth Hockey." Well, no its not ....

Griffin Decl., Ex. 26. Consumers have also approached Defendant and Defendants' customers expressing actual confusion between the Mark and Logo and Plaintiffs' hockey team. For example, on July 14, 2025, Mr. Olson was wearing a t-shirt bearing the Mark and Logo after a hockey game

in Beaverton, Oregon and was asked by another player whether the shirt was from Plaintiffs' hockey team. Olson Decl. at ¶ 52. Similarly, on September 14, 2025, a teammate of Mr. Olsen conveyed that another player had asked him whether a water bottle bearing the Mark and Logo was from Plaintiffs' hockey team. *Id.* at ¶ 53. Actual confusion will only increase after the NHL season starts next month. Here, the actual confusion to date favors a finding of likelihood of confusion. *See Instructure, Inc.*, 2022 U.S. Dist. LEXIS 2822, *37-38 ("there is some evidence of actual confusion, which contributed to a finding of likelihood of confusion."). Thus, this factor favors a likelihood of confusion.

### d) *Similarity of The Products and Manner of Marketing*

"The greater the similarity between the [parties'] products, the greater the likelihood of confusion." *Sally Beauty Co.*, 304 F.3d at 974. "The issue is not whether the goods and services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both." *Instructure, Inc.,* 2022 U.S. Dist. LEXIS 2822, *38. Here, there is no question that the parties sell the same products in the same sales channels – namely, hockey-related products, including hockey bags, primarily by internet advertising and online sales. Thus, this factor weighs heavily in favor of likelihood of confusion. *Sec. USA Servs., LLC*, 2023 U.S. Dist. LEXIS 46962, *12-13 ("Likelihood of confusion is obvious when two companies sell the same thing under the same name.").

### e) *The Degree of Care Likely to Be Exercised by Purchasers*

"The effect of purchaser care, while relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue in that 'confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to

assume nonetheless that the seller is affiliated with or identical to the other party.'" *Basis Int'l Ltd. v. Research in Motion Ltd.*, 827 F. Supp. 2d 1302, 1309-1310 (D.N.M. 2011). In this case, the nearly identical nature of the Mark and Accused Mark, and accompanying logos of a mammoth's head, "attenuates any discrimination a sophisticated user might bring to bear in purchasing this product." *Id.* Accordingly, this factor weighs in favor of likelihood of confusion.

> f)   The Strength or Weakness of The Marks

In reverse confusion cases, the more powerful defendant commercially overwhelms the market and saturates the public conscience with its own use of the mark, thereby weakening and diminishing the value of the plaintiff's mark. "Accordingly, when assessing the distinctiveness of the mark in a reverse-confusion case, the district court should consider both the conceptual strength of the plaintiff's mark and the relative commercial strength of the defendant's mark." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th at 129. "The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion." *Sally Beauty Co.*, 304 F.3d at 975.

Here, Defendant's Mark and Logo are conceptually strong in that it is an arbitrary mark that is "inherently distinctive," and therefore entitled to the greatest protection. *Donchez*, 392 F.3d at 1216. Plaintiffs readily admit the commercial strength of the Accused Mark and Logo. Dkt. No. 2 at ¶¶ 1, 16. For the past few months, Plaintiffs and their licensees advertise and sell "a wide variety of" goods bearing the Accused Mark and Logo online, which Plaintiffs state have "gained substantial public recognition throughout the United States." Dkt. No. 2 at ¶ 17. The recent commercial success of the Accused Mark and Logo combined with the conceptual strength of Defendant's Mark, pushes this factor firmly in Defendant's favor. *Wreal, LLC*, 38 F.4th at 129.

### g) *Plaintiffs Have No Defense to Infringement Because They Lack Good Faith*

Despite their obvious infringement, Plaintiffs may have defense if they can show they (1) adopted the mark in good faith, *and* (2) use the mark in a remote geographic area. *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir. 1990). Plaintiffs bear the burden of proof as to both "good faith" and "remoteness." *Id*. Plaintiffs cannot show either. As explained above, Plaintiffs adopted the Defendant's Mark and Logo in bad faith. Plaintiffs' bad faith alone defeats Plaintiffs' defense entirely, and thus remoteness is irrelevant. Nonetheless, Plaintiffs also cannot show remoteness because, like Defendant, Plaintiffs sell their hockey-related goods online. Plaintiffs have only one physical location in Utah. Plaintiffs have not physically entered another state to sell their goods. Accordingly, Plaintiffs have no defense to Defendant's trademark infringement claims.

### h) *Plaintiffs' Assertion That Defendant Consented to Their Use Is Absurd*

Plaintiffs dare argue that Defendant acquiesced to the Accused Mark and Logo because Defendant "never objected to [them] during the extensive, highly publicized selection process" that began in April 2024. Dkt. No. 2 at ¶ 29. But Plaintiffs' selection process was only extensive and highly publicized because of Plaintiffs' inability to choose a name for more than a year as a result of the USPTO's numerous rejections of their trademark applications. By June 2024, the fans were still voting on six names, with UTAH YETI reportedly the favorite. By March 2025, the fans were still voting on three names, including UTAH MAMMOTH. In April 2025, Plaintiffs expressly *told* Defendant that they had not "yet" decided on a name but would consider a "partnership" with Defendant should they choose MAMMOTH. Defendant only learned of the choice when they

announced UTAH MAMMOTH in May 2025. In June 2025, after obtaining legal counsel,[3] Defendant timely objected to Plaintiffs' use of the name and demanded they cease and desist immediately. Plaintiffs' suggestion that Defendant sat on its hands during their inept selection process is made with ill grace considering their own lack of good faith in choosing the name.

Plaintiffs further argue that Defendant consented to their use of the Mark and Logo in a Facebook comment in June 2024 and its initial contact with Plaintiff in April 2025. Plaintiffs' reliance on these innocuous comments is misplaced. On Facebook, Defendant merely posted that it was "partial" to the MAMMOTH name among the many others being considered by Plaintiffs and the fans at the time, not because it had consented to Plaintiffs' use of the Mark and Logo, but because it had spent the last eleven years establishing them for its business. Olson Decl. ¶ 44. Indeed, Defendant posted its comment under the Mark and Logo, putting Plaintiffs on notice of its ownership of both almost a year before Plaintiffs took them. Plaintiffs had the burden to investigate the Mark and Logo but failed to do so. Plaintiffs now attempt to improperly shift the burden to Defendant to investigate their failed attempts to change their team's name, which has been a never-ending moving target. This was hardly consent.

Similarly, in April 2025, having not heard anything from Plaintiffs about their intentions to use the Mark, Defendant expressly informed them that it owned the Mark and Logo, and that

---

[3] Defendant's co-owners are businessmen who run a small, independent businesses and, unlike Plaintiffs, did not already have trademark attorneys on retainer. Thus, Defendant had to take steps to locate counsel who could take on this matter and who was not conflicted from the representation. Olson Decl. ¶ 49. As soon as that occurred, Defendant's counsel sent a cease-and-desist letter to Plaintiffs on June 10, 2025. Griffin Decl. ¶ 20.

Plaintiffs should speak with Defendant before they used them. The fact that Plaintiffs responded that they would "keep this partnership in mind" was a tacit acknowledgement that they understood they could not use the Mark and Logo without first speaking with Defendant – something Plaintiffs did with Yeti, albeit unsuccessfully. The idea that Defendant, after eleven years of building the Mark and Logo, voluntarily surrendered it to Plaintiffs through this brief initial exchange is absurd.

### B. Defendant Will Suffer Irreparable Harm if an Injunction is Not Granted

If Defendant is not granted an injunction prohibiting Plaintiffs from using its Accused Mark in connection with the advertising and sale of hockey-related goods, including hockey bags, Defendant will suffer irreparable harm. Indeed, because the Defendant is likely to succeed on its claim against Plaintiffs for trademark infringement as set forth above, Defendant's irreparable harm is presumed under the Trademark Modernization Act. 15 U.S.C. § 1116(a).

Irreparable harm is also established under reverse confusion case law. *Instructure, Inc.*, 2022 U.S. Dist. LEXIS 2822, *43-44. Defendant has built up over the past eleven years good will and a reputation for quality goods in the hockey community, where prominent and respected coaches and hockey players have praised the Defendant's hockey bags. But four months ago, Plaintiffs saturated the market with its hockey bags and apparel bearing the Accused Mark and Logo. Griffin Decl. ¶¶ 20-25 and Exs. 18-21. As Plaintiffs themselves acknowledge their own hockey bags cost substantially less than Defendant's "high-end hockey bags," and are of a different caliber than Defendant's "specialty equipment bags." Dkt. No. 2 at ¶ 2, and Ex. B thereto, p. 2.

Because Plaintiffs saturated the market with merchandise bearing the Accused Mark and Logo, Defendant will continue to lose value in its Mark and Logo, its product identity, control over its goodwill and reputation, and its ability to expand into new markets. Consumers will mistakenly

believe Defendant's hockey-related goods, including its hockey bags, are connected to Plaintiffs' hockey team. Fans who support another team will not purchase Defendant's hockey-related goods due to their mistaken belief that they would be supporting their team's rivals. Defendant will therefore suffer irreparable harm.

### C. **The Irreparable Harm to Defendant Outweighs Any Harm to Plaintiffs**

Plaintiffs on the other hand will suffer no such harm, as they can simply resume using the UTAH HOCKEY CLUB mark, which they have used for the past year and for which they now own a registered trademark. To the extent Plaintiffs suffer any harm, it is self-inflicted by knowingly and intentionally choosing to take Defendant's Mark as their own, well-aware that Defendant sells the same hockey-related goods in the same channels. When a party "knowingly takes actions that increase the potential for harm if an injunction is ordered against them, courts give those harms little weight in the balancing test." *Bad Ass Coffee v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237, 1251 (D. Utah 2009). Plaintiffs cannot avoid an injunction "by claiming harm to a business built upon infringement." *See Sec. USA Servs.*, 2023 U.S. Dist. LEXIS 46962, *16.

### D. **An Injunction Will Not Adversely Affect the Public Interest**

"Infringement and dilution of trademarks are inherently contrary to the public interest." *Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1169 (D. Utah 2007). "[I]t almost always will be the case that the public interest will favor the [trademark owner]" when there is a risk of confusion, because otherwise the public will be harmed through unauthorized, deceptive trademark uses. *Sec. USA Servs., LLC*, 2023 U.S. Dist. LEXIS 46962, *16. Here, an injunction is in the public's interest because it will prevent confusion in the marketplace.

## IV. CONCLUSION

For the foregoing reasons, Mammoth Hockey respectfully requests that the Court grant its motion for a preliminary injunction and issue an Order enjoining Plaintiffs from any and all use of the Accused Mark and Logo.

Date: September 25, 2025

/s/ Gerald W. Griffin

Gerald W. Griffin (*admitted pro hac vice*)
Leonardo Trivigno (*admitted pro hac vice*)
Meredith Spelman (*admitted pro hac vice*)
Jodutt Basrawi (*admitted pro hac vice*)
Janice J. Kwon (*admitted pro hac vice*)
CARTER LEDYARD & MILBURN LLP
28 Liberty Street, 41st Floor
New York, New York 10005
212-238-8610
griffin@clm.com
trivigno@clm.com
spelman@clm.com
basrawi@clm.com
kwon@clm.com

R. Jeremy Adamson (12818)
Catherine M. Maness (16885)
BUCHALTER
A Professional Corporation
60 E. South Temple, Suite 1200
Salt Lake City, Utah 84111
(801) 401-8625
jadamson@buchalter.com
cmaness@buchalter.com

*Attorneys for Mammoth Hockey, LLC*