R. Jeremy Adamson (12818)
Catherine M. Maness (16885)
BUCHALTER
A Professional Corporation
60 E. South Temple, Suite 1200
Salt Lake City, UT  84111
(801) 401-8625
jadamson@buchalter.com
cmaness@buchalter.com

*Attorneys for Mammoth Hockey, LLC*

Gerald W. Griffin (*admitted pro hac vice*)
Leonardo Trivigno (*admitted pro hac vice*)
Meredith Spelman (*admitted pro hac vice*)
Jodutt Basrawi (*admitted pro hac vice*)
Janice J. Kwon (*admitted pro hac vice*)
CARTER LEDYARD & MILBURN LLP
28 Liberty Street
New York, New York 10005
212-238-8610
griffin@clm.com
trivigno@clm.com
spelman@clm.com
basrawi@clm.com
kwon@clm.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UYTE, LLC and SEG HOCKEY, LLC,<br><br>      Plaintiffs,<br><br>vs.<br><br>MAMMOTH HOCKEY, LLC<br><br>      Defendant. | **DECLARATION OF ERIK OLSON IN SUPPORT OF DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No.: 2:25-cv-00639-DB<br><br>Judge David Barlow |

I, Erik Olson, declare the following:

1.    I am a co-owner and co-founder of Defendant Mammoth Hockey, LLC ("Mammoth Hockey" or the "Company").  I submit this Declaration in support of Mammoth Hockey's motion for a preliminary injunction against plaintiffs Uyte, LLC ("Uyte") and SEG Hockey, LLC ("SEG") (collectively "Plaintiffs").

**The Background of Mammoth Hockey**

2.      In 2014, I co-founded Mammoth Hockey, a small business in Portland, Oregon, together with my friend, Lars Huschke, a product designer, who shares my passion for hockey.

3.      A few years before, I had resumed playing hockey in some local leagues and had to go out and buy all new equipment.  The one piece of gear that ended up blowing out in less than one year was my hockey bag. The seams tore and the fabric ripped in a couple spots, so I decided to replace it, and looked to purchase a quality hockey bag that would last a long time.

4.      After looking around for the perfect hockey bag to buy, it appeared to me that nobody was putting much effort into hockey equipment bags. There were a lot of bags made from cheap materials, which looked like afterthoughts of large companies that were more focused on the quality of their flagship hockey sticks or skates. Then there were "pro" style bags that were essentially just duffle bags made from a durable material. These bags lacked any sort of features. No one was selling a bag constructed from the best materials combined with features tailored to local league players.

5.      I pitched the idea of creating a top shelf hockey bag to Mr. Huschke, an industrial designer with experience designing hard and soft goods for dozens of companies in the outdoor industry.  Mr. Huschke agreed, and we decided to collaborate and form a business to design and produce a hockey bag which embodied durability.

6.      We chose the name "Mammoth Hockey" ("the Mark") as our Company's name and for our products' trademark, because it signifies strength, endurance and resilience due to the Ice Age animal's size and ability to survive harsh conditions.  These qualities all aptly describe what we have sought, continue to seek, and to achieve in the design and manufacture of the hockey bags

and other hockey-related goods that we sell.  Mr. Huschke himself personally designed the logo of a Mammoth's head (the "Logo") to accompany our Mark.

7.      We registered Mammoth Hockey as a limited liability company in the State of Oregon on February 6, 2017. Attached hereto as **Exhibit 1** is a true and correct copy of the Company's Articles of Organization, filed with the Oregon Secretary of State, and attached hereto as **Exhibit 2** is a true and correct copy of a Business Registry Business Name Search of the Company reflecting the next renewal date as February 6, 2026.

**Mammoth Hockey's Development of its Prototype Hockey Bags**

8.      To develop our first protype bags, we used our own personal funds and also raised start-up capital through an online "Kickstarter Campaign" webpage, which went live on June 3, 2014, seeking public contributions over a thirty-day period.  Attached hereto as **Exhibit 3** is a true and correct copy of the Company's Kickstarter webpage (https://www.kickstarter.com/projects/1389885168/mammoth-hockey-bags).

9.      From the moment it went live in 2014, the Company's Kickstarter Campaign webpage bore the Mark and Logo.  *Id.*  So too did all of the prototypes pictured on the Campaign's webpage, as well as all of the other accessories we offered to give to potential contributors, including t-shirts, hoodies, and puck bags.  *Id.*

10.     The creation of the Company's prototype bags involved countless hours of Mr. Huschke's and my time, as well as substantial resources.

11.     In developing our first prototype bag, the most important feature was its durability, because none of the other features of the bag would matter if the bag itself was not tough enough to last.  So, when we were developing our first prototype, we decided to use a vinyl-coated

polyester truck tarp material for the exterior. The cut and sew shop we used in Spokane, Washington to craft our prototype had already used this same material in hockey bags it had manufactured for a Western Hockey League major junior hockey team, which meant it had been tested under difficult conditions. A photo of our first prototype bag follows.



12.     In addition to the main gear compartment, Mr. Huschke and I designed the top flap of the prototype bag as a zippered sleeve to stow a towel and change of clothes, while separating them from other gear below. We also added a zippered side pocket to store stick and sock tape, and larger pockets on both sides of the bag to hold water bottles or shampoo.





13.     We tested our initial version 1.0 prototype in two adult leagues for two seasons, plus morning pickup games, and on plane travel to out-of-town tournaments. We then refined the features of the bag and its construction and produced a version 2.0 prototype.

14.     The Company's 2.0 prototype upgraded the main material from a 10-ounce weight to 18-ounce weight, and added stiff piping to help the bag hold its shape even when it was empty as shown in the photo below.



15.     We had found with the version 1.0 prototype bag that the bright yellow floor of the bag did not provide enough reflected light to see miscellaneous items such as socks and pucks.  To make the inside of the bag brighter, we lined the bag with silver pack cloth, which also made the bag even more durable.



v1.0 liner vs V2.0 liner

16.     In the version 2.0 prototype bag, we also added grommets to the top flap for airflow and increased the size of the Mammoth Mark and Logo.



v1.0 vs v2.0 design changes

17.     Our initial ventilation concept in the original prototype had the sides of the side pockets open to increase airflow, as shown in the picture below. But during testing of the bags, we

found that people naturally wanted to put shower supplies and water bottle in these pockets. So, in the version 2.0 prototype, we closed up the sides, while leaving the top open for ventilation.


v1.0 side venting

18.     In addition, for the version 2.0 prototype, we stopped using plastic hardware and instead used metal hardware.


v1.0 hardware vs v2.0 hardware

19.     We developed a further prototype, version 2.1., to which we added a burly finished edge to prevent fraying.


v1.0 handle wrap vs v2.1 handle wrap

20.     Also, for the version 2.1 prototype, we added a shoulder strap pad and the inner pocket for wallets and keys.


*v2.1 additions*

**The Company's Launch of the Marketing and Sales of Its First Hockey Bags**

21.     Once we were satisfied with our prototype, in May 2014, Mr. Huschke met with former professional national hockey league player, Mike Lundin, to get his feedback on the design from a professional perspective. With that final insight, we felt confident to move ahead with the design.

22.     The Company had its first bags manufactured for sale in October 2014, and as shown below, they were designed to include the Mark and Logo.



23.     With our hockey bags manufactured and ready to sell, we designed the Company's website, and it went live in 2014 at https://www.mammoth-hockey.com/ (the "Website"). Attached hereto as **Exhibit 4** is a true and correct copy of the Company's home webpage (https://www.mammoth-hockey.com/). At all times, the Company's Website has displayed the Mark and Logo and has continued to offer all of Mammoth Hockey's products for sale for the past eleven years. The Website also provides details on the pricing and specifications for the

Company's products, as well as videos demonstrating their use. The Website has been fully active since 2014 and has received hundreds of thousands of views.

24.     From 2014 until May 7, 2025, when Plaintiffs saturated the market with its "Utah Mammoth" mark, an internet search for "mammoth hockey bags" would yield as its first result the Company's Website.

**The Company's Continued Design Improvements and New Products Offered for Sale on Our Website**

25.     After the initial launch of the original Mammoth hockey bag, Mr. Huschke and I endeavored to constantly find ways to improve the designs of the Company's products. In 2015, the Company updated the original Mammoth bag, as shown below, with an improved top portion of the bag. This redesigned bag was offered for sale on the Company's Website.



26.     In 2015, the Company also added a new hockey bag model: the Oglethorpe. The Oglethorpe was a simplified, less expensive, pro style version of the flagship Mammoth Bag, but included innovative and bold features, like a circus tent zipper for a smooth and robust zipper movement, as well as sturdy seatbelt webbing straps. This bag was also offered for sale on the Company's Website.

27.     In 2016, the Company continued to advance our bag designs, and in addition to introducing an updated design to our original hockey bags, the Company also introduced two more models of hockey bags: (1) the Tender Goalie Bag and (2) the Mammoth Reggie Coach/Referee

Bag. The Tender Goalie bag, shown below, was manufactured with the same highly durable seatbelt webbing straps and 18-ounce truck tarp exterior as its other bags, but was a larger model that featured a wide mouth opening for leg pads, capable of storing a goalie's bulky equipment. This bag was also offered for sale on the Company's Website.



28.     The Reggie Coach/Referee Bag, shown below, was a compact hockey bag, designed for coaches and referees who didn't have much bulky gear to carry, but still had the same highly durable, high-quality components as its other models.  This bag was also offered for sale on the Company's Website.



29.     In 2018, the Company released the Bombay Player Bag, shown below, to provide a smaller hockey bag for players who need less or smaller equipment (*i.e.*, youth players). The bag was designed with the same sturdy materials as previous models and the same interior silver lining to aid players in finding what they need.  This bag was offered for sale on the Company's Website.



30.    In 2021, Mr. Huschke and I decided to change the color of the Mammoth Hockey brand to red, and to collaborate with Chang Houng, Enterprise Co. Ltd., a manufacturer in Taiwan, to source new materials and obtain more competitive pricing. This collaboration, in addition to our continued relationship with Robinson Windword, Inc., a USA-based manufacturer, resulted in the creation of the Duralite Goalie Bag, the Duralite Player Bag, and Player Bag (medium and large), which are all currently available for sale on the Company's Website.

31.    The Duralite Goalie Bag, shown below, is the strongest and lightest goalie bag made by the Company yet. It is constructed of EcoPak, a durable and waterproof fabric made from 100% recycled polyester fiber and film, with a silver ripstop Recycled Bag Cloth lining to help brighten the interior of the bag. The Duralite Goalie Bag also uses real seatbelt webbing for its straps and sturdy brass zippers throughout. Attached hereto as **Exhibit 5** is a true and correct copy of the Company's product webpage (https://www.mammoth-hockey.com/products/duralite-goalie-bag) showing the price and specifications of the Duralite Goalie Bag.



32.    The Duralite Player Bag, shown below, is a slightly smaller bag compared to the Duralite Goalie Bag, but uses the same high-quality and highly durable materials.  Attached hereto as    **Exhibit    6**    is    a    true    and    correct    copy    of    the    Company's    product    webpage

(https://www.mammoth-hockey.com/products/duralite-player-bag) showing the price and specifications of the Duralite Player Bag.



33.    Also currently available on the Company's Website is the "Player Bag," as shown below, which is constructed of "Bombproof" 18-ounce truck tarp, with seatbelt webbing shoulder straps, lined with silver pack cloth, and sturdy brass zippers throughout.    Attached hereto as **Exhibit 7** is a true and correct copy of the Company's product webpage (https://www.mammoth-hockey.com/products/copy-of-player-bag-medium) showing the price and specifications of the "Player Bag-Medium".



34.    In October 2024, we added our most recent addition to the Company's line of hockey bags, the Wheeled Player Bag, shown below.  The Wheeled Player Bag utilizes the same materials as the Player Bag and also includes the addition of solid wheels with high quality bearings to ensure that the wheels would stand the test of time. This bag is also currently available for purchase on the Company's Website.  Attached hereto as **Exhibit 8** is a true and correct copy of the Company's product webpage (https://www.mammoth-hockey.com/products/player-bag-large-wheelie) showing the price and specifications of the "Wheeled Player Bag".



35.     For the past eleven years, Mammoth Hockey has been selling all of the foregoing hockey bags and other hockey-related goods through the Company's Website to customers in forty-seven states, except for Hawaii, Mississippi, and North Dakota. Attached hereto as **Exhibit 9** is a true and correct copy of fulfilled orders evidencing the first and most recent sales of Mammoth Hockey products to customers in forty-seven states. All of the Company's products have always been sold and marketed under the Mark and Logo.

**The Company's Marketing and Promotion of Its Products Bearing the Mark and Logo**

36.     Mammoth Hockey has promoted its products on its Website, and through several social media websites we set up on the Company's behalf.

37.     Mammoth Hockey operates an Instagram account to market its products, under the account name of "@mammothhockey," which bears the Mammoth Hockey Mark and Logo. That account has been active since the Company's first post on May 23, 2014, shown below, containing a picture of a Mammoth Hockey bag bearing the Mark and Logo.



38.     Mammoth Hockey has also maintained a Facebook page since 2014, under the "handle" of the Mammoth Hockey Mark and Logo, that we regularly update with new photos and marketing materials for Mammoth Hockey's products. Attached hereto as **Exhibit 10** is a true and copy of the Company's Facebook page (https://facebook.com/mammothbags/). From October 1, 2024, to September 2, 2025, that Facebook page received more than 541,374 views.

39.     Mammoth Hockey also publishes videos about its products on its YouTube channel which also bears the Mammoth Hockey Mark and Logo, and which has garnered more than twelve thousand views through September 2, 2025.  Attached hereto as **Exhibit 11** is a true and correct copy of the Company's YouTube page (https://www.youtube.com/channel/@mammothhockey3228).

40.     Mammoth Hockey also promotes our products in the hockey community by sponsoring various hockey teams and tournaments in multiple locations, including in Oregon, Washington, Minnesota, and Canada, where the Mark and Logo are prominently displayed. Mammoth Hockey's participation in various communities include the Mammoth Hockey Club

team in Beaverton, Oregon (2016 to 2020); the Mammoth Hockey Club team in Sherwood, Oregon (2018 to present); the Mammoth Hockey Club team in Vancouver, Washington (2022 to present); the Winter Shootout Hockey Tournament in Sherwood, Oregon (2019 to present); the Lil Cuties Two Ships hockey tournament in Vancouver, Washington (2021); and the Return of the Robin tournament in Rochester, Minnesota (2015). Mammoth Hockey has also sponsored Beau Karn of Karn Skating Dynamics in St. Louis, Missouri (2017 to present).

41.     At these events which the Company sponsors, we (Mr. Huschke and I) or several members of the teams that we are sponsoring hand out coupon cards for Mammoth Hockey's products, as well as stickers, hats, and postcards, all bearing the Mark and Logo as shown below, to promote our brand and products.  Attached hereto as **Exhibit 12** is a true and correct copy of the front and back of a coupon card, stickers, hats, and postcards, that we distribute at the events sponsored by Mammoth Hockey.



**Mammoth Hockey Has Built Up a Reputation For Quality Goods Under the Mark and Logo**

42.     As a result of the substantial investment of our time, money and effort to develop and market the Company's products, our highly durable hockey bags are now nationally well-known for their quality and durability compared to conventional bags.

43.     Mammoth Hockey's bags have been reviewed favorably by prominent figures in the national and international hockey community, which have been viewed by hundreds of thousands of potential customers nationwide. For example:

- Jeremy Rupke has a social media following of over 2.7 million people. In his review, which has been viewed over 60,000 times, Mr. Rupke states that the Mammoth Hockey bags are "definitely the best bags [he's] seen quality-wise on the market … It'd be hard to make a better [hockey] bag." Attached hereto as **Exhibit 13** is a true and correct copy a screenshot of a YouTube video review by Jeremy Rupke of the "Coach Jeremy" YouTube account (https://www.youtube.com/live/UDX7RKlLZxQ) at 4:52-57.

- Hockey Tutorial, operated by Chris Kibui, has a social media following of over 295,000 people, and is an official partner of Red Bull and the NHL. In his review, which has been viewed over 40,000 times, Mr. Kibui states that the Mammoth Hockey bag is "the last hockey bag you'd ever need to buy," and that the bag is "far more durable" than other bags. Attached hereto as **Exhibit 14** is a true and correct copy of a screenshot of a YouTube video review by Chris Kibui of the "Hockey Tutorial" YouTube account (https://www.youtube.com/watch?v=Ew3S2IS38mY) at 6:34-47.

- Mr. Kibui again reviewed the Client's bag with Tommy Huggett, a professional hockey player. In his review, which has been viewed over 22,000 times, Mr. Huggett states, "I have to use the team bag, but if it was my choice I'd absolutely use this." Attached hereto as **Exhibit 15** is a true and correct copy of a screenshot of a YouTube video review by Chris Kibui of the "Hockey Tutorial" YouTube account, featuring Tommy Huggett (https://www.youtube.com/watch?v=Nd-6BgNviHM) at 7:27-40.

- The Hockey World Blog also states that the "quality of materials, the craftsmanship, and the attention to detail are all prevalent" in the Client's hockey bags. Attached hereto as **Exhibit 16** is a true and correct copy of the Hockey World Blog article entitled "Mammoth IPA Player Bag Review," dated June 2, 2025, (https://hockeyworldblog.com/2015/06/02/mammoth-ipa-player-bag-review/).

## My Comments About Plaintiffs' Team Name Voting and My Interactions With Plaintiffs' Representative Were In No Way An Offer to Use The Company's Mark and Logo

44.　　In June 2024, I became aware that Plaintiffs had announced that their fans had voted on 20 potential new names for their hockey team and had narrowed it down to six finalists: Utah Blizzard, Utah Hockey Club, Utah Mammoth, Utah Outlaws, Utah Venom and Utah Yeti. I commented on the Mammoth Hockey's Facebook and Instagram pages that "We're pretty partial to this one," and circled in yellow highlighting the word "Mammoth." Dkt. No. 2 at ¶ 25. My comment was just pointing out the obvious, that of course our Company liked this name, because we had already chosen it, and spent the last eleven years investing our time and money in developing our reputation and substantial good will for the business under that name. By posting this comment on our Facebook and Instagram pages, both of which bear the Mammoth Hockey Mark and Logo, I was merely letting the public and Plaintiffs know that fact. *Id.* My public comment identifying MAMMOTH as our Company's name was certainly not in any way an offer to Plaintiffs to take and use our Company's Mark and Logo.

45.　　On February 13, 2025, Rachel Moffitt, assistant to the President of Hockey Operations for Plaintiffs' team, contacted Mike Lundin, the professional hockey player who had previously sponsored the Company, inquiring about myself and Mr. Huschke, and how she could

contact us. But Plaintiffs never initiated contact with us after this inquiry, let alone contact us to discuss the Mark and Logo.

46.     After hearing about this interaction between Mr. Lundin and Ms. Moffitt, on April 14, 2025, I sent a LinkedIn direct message to Ms. Moffitt, stating the following:

> Hi Rachel, I'm Erik Olson, co-founder of Mammoth Hockey here in Portland, Oregon. I had heard through the grapevine you were asking around about our hockey bag company. If the Utah Hockey Club ends up being the Mammoth next season … then it would be cool to talk about a possible collaboration.

*See* Dkt. No. 2 at ¶¶ 26-27.  After hearing about their inquiry to Mr. Lundin about the Company, we wanted to ensure that we were able to protect the Mark under mutually agreeable terms with Plaintiffs. This message I sent was a good faith effort to offer Plaintiffs the opportunity to discuss our Mark and Logo, and to politely open a dialogue to see if there was a mutually acceptable agreement that we could come to should they decide they would like to use the Mark.  This message was in no way a suggestion to Plaintiffs that they were free to use the Mark and Logo that Mr. Huschke and I had spent the past eleven years of our lives developing and cultivating for the Company and its products. Without the Mark and the good will we have garnered under it, the Company would have no business, and if Plaintiffs are permitted to take the Mark, we would have to start our business all over with a new brand.

47.     On April 24, 2025, Ms. Moffitt responded to my April 14th message, stating the following:

> Hi Erik, I had a chance to speak with [the President] and he said they have not reached any determinations yet but will definitely keep this partnership in mind should things end up moving in that direction.

*Id*.

**Plaintiffs' Sudden Flooding Of The Market With The "UTAH MAMMOTH" Mark Has Caused Actual Confusion And Will Cause the Company Irreparable Harm**

48.     Only days after my interaction with Ms. Moffitt, on May 7, 2025, with no notice to myself or the Company, Plaintiffs announced that they were changing their NHL team's name to "UTAH MAMMOTH" (the "Accused Mark"), and that the name would be used in connection with hockey-related goods, including hockey bags, in combination with a logo depicting a mammoth's head (the "Accused Logo"). This came as a shock to us at the Company, as we had not been following the news around Plaintiffs' name selection process on a regular basis, and we had not received any further communications from Ms. Moffitt or any other representative of Plaintiffs.

49.     Upon discovering the fact that Plaintiffs officially chose "UTAH MAMMOTH" as its new team name, I took steps to locate legal counsel who could help us with our trademark infringement concerns regarding Plaintiffs' new name and logo. One of the attorneys we initially contacted advised they were conflicted from representing the Company.  We eventually were able to locate and retain our present counsel.

50.     As the co-owner and co-founder of the Company, Plaintiffs' announcement that they had adopted the "UTAH MAMMOTH" as its new team name caused me significant concern. In particular I was worried that Plaintiffs, which were significantly larger companies than Mammoth Hockey, had started to use our Company's name with the logo of a mammoth's head to immediately begin to sell hockey bags and other hockey-related goods, which would most certainly confuse the Company's current and future customers, and irreparably harm the Company's business.

51.     Since Plaintiffs began using the Accused Mark and Logo on May 7, 2025, I have personally been involved in, or have been informed about, two separate instances of actual confusion where individuals believed our Company was affiliated with Plaintiffs' hockey team.

52.     On July 14, 2025, I personally was wearing the Mammoth Hockey T-shirt pictured below after a game in a recreational Over-35 league at the Winterhawks Skating Center in Beaverton, Oregon, when another player in the league, Mr. Alati, asked me if my shirt was from the Utah Mammoth.



53.     In a separate incident, on September 14, 2025, a teammate on one of my hockey teams at Sherwood Ice Arena, located in Sherwood, Oregon, Mr. Jeewanjee, told me that a player on the bench with him at a morning pickup game asked him if his Mammoth Hockey water bottle, pictured below, was from the new Utah Mammoth team.



54.     If the Plaintiffs are permitted to continue to use the Accused Mark and Logo, the Company's image and reputation will suffer. The Company is known to be a source of highly durable hockey bags. The Company's ability to control the messaging of the Company's brand and quality of how its products are made, sold, and perceived, will be compromised. This is something that Mammoth Hockey, a small but growing company, takes extremely seriously and

indeed, built our brand on. Should the quality of the Plaintiffs' bags bearing the Accused Mark and/or Logo be less than those of the Company (*i.e.*, fabric that rips or tears or zippers that get stuck or broken after some use), then customers and potential customers would mistakenly believe the Company is responsible for such production. Should a consumer have a bad experience with hockey-related goods purchased from Plaintiffs, the Company's reputation and good will is vulnerable to harm.

55.     We are equally concerned that a consumer looking to purchase a product from the Company will mistakenly purchase that product from Plaintiffs. Such types of loss would be extremely difficult, if not impossible, to quantify, and therefore irreparably harm the Company.

56.     In addition, there is a very real risk of a loss of business from customers and potential customers who support teams in competition with Plaintiffs' team. Individuals who want to purchase a hockey bag but are under the mistaken or confused belief that the Company is associated or affiliated with Plaintiffs' team, a rival to their preferred team, may very well refuse to purchase bags from the Company.

57.     The foregoing are just a few examples of how the Company would be irreparably harmed, should Plaintiffs continue their use of the Accused Mark and Accused Logo. If Plaintiffs, which are much larger entities than the Company, are allowed to continue their use of the Accused Mark and Accused Logo and confuse our customers, it would be very difficult for the Company to continue its decade-long business as "Mammoth Hockey." It may force us to have to change the business model in which Mr. Huschke and I have invested so much of our personal time and money in developing the good will under the Mammoth Mark and Logo for over ten years.

58.     Furthermore, Mammoth Hockey has potential plans to expand its business, including the following:  selling wholesale to brick-and-mortar hockey stores; selling wholesale to large internet retailers such as Pure Hockey/TSG Sports Group; advertising in USA Hockey Magazine; advertising on rink boards; sponsoring the US Pond Hockey Championships in Minneapolis, Minnesota; and exhibiting at national hockey trade shows such as Let's Play Hockey Expo.  Our Company's ability to expand its business is now threatened by Plaintiffs' use of our Mark and Logo and the ensuing confusion it causes consumers.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing statements are true and correct.

Executed on September 25th, 2025 at Portland, Oregon

_____
Erik Olson