Michele M. Myer (#13815)
**DORSEY & WHITNEY LLP**
111 S. Main Street, Suite 2100
Salt Lake City, UT
Telephone: (212) 415-9200
Fax: (801) 933-7373
myer.michele@dorsey.com

*Attorneys for Plaintiffs*

Bruce Ewing (admitted *pro hac vice*)
**DORSEY & WHITNEY LLP**
51 West 52nd Street
New York, NY 10019
Telephone: (212) 415-9200
Fax: (801) 933-7373
ewing.bruce@dorsey.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UYTE, LLC and SEG HOCKEY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MAMMOTH HOCKEY, LLC,<br><br>Defendant. | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No.: 2:25-cv-00639-DBB-CMR<br><br>Judge David B. Barlow<br>Magistrate Judge Cecilia M. Romero |

Plaintiffs Uyte, LLC and SEG Hockey, LLC ("Plaintiffs") submit this memorandum in opposition to the Motion for Preliminary Injunction (the "Motion," Dkt. 29-31) of Defendant Mammoth Hockey, LLC ("Defendant").

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     BACKGROUND ............................................................................................................2

III.    LEGAL STANDARD......................................................................................................9

IV.     ARGUMENT................................................................................................................11

    A.      Defendant Has Not Made a Strong Showing of Irreparable Harm.......................11
    B.      Defendant Has Not Shown a Strong  Likelihood of Success on the Merits .........17

        1.      There Is No Strong Showing of Likely Reverse Confusion .....................17

            a.      The Parties' Marks, Viewed in Their Entireties, Are
                  Dissimilar.................................................................................. 18
            b.      The Intent Factor Favors Plaintiffs ............................................... 20
            c.      There Is No Competent Evidence of Actual Confusion, and
                  Plaintiffs' Survey Evidence Shows Confusion Is Unlikely .......... 22
            d.      The Parties' Goods and Marketing Are Not Competitively
                  Proximate ..................................................................................... 25
            e.      Purchasers of Expensive Hockey Bags Are Likely to
                  Exercise a Significant Degree of Care .......................................... 31
            f.      Defendant's Designation Is Weak ................................................. 31

        2.      Defendant Is Not Entitled to a Nationwide Injunction ..............................33

    C.      The Balance of Hardships Tips Decisively in Plaintiffs' Favor ............................34
    D.      An Injunction Would Be Contrary to the Public Interest ......................................35
    E.      In the Unlikely Event a Disfavored, Mandatory Preliminary Injunction
        Issues, the Court Should Require a Substantial Bond...........................................36

V.      CONCLUSION..............................................................................................................37

# TABLE OF AUTHORITIES

**Cases**

*AG of Okla. v. Tyson Foods, Inc*.,
  565 F.3d 769 (10th Cir. 2009) ................................................................................................ 35

*Altira Grp. LLC v. Philip Morris Co.*,
  207 F. Supp. 2d 1193 (D. Col. 2002).................................................................... 17, 18, 21, 35

*AMF, Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) .................................................................................................. 32

*Are You Listening Yet PAC v. Henderson*,
  No. 2:24-CV-00104-JNP, 2024 U.S. Dist. LEXIS 42750 (D. Utah Mar. 11, 2024) ................ 10

*Blendtec Inc. v. BlendJet Inc.*,
  No. 2:25-cv-00096-RJS-DPB, 2025 U.S. Dist. LEXIS 183632 (D. Utah Sep. 17, 2025).. 10, 11

*Casa Tradición S.A. de C.V. v. Casa Azul Spirits, LLC*,
  Civ. Act. No. H-22-2972, 2022 U.S. Dist. LEXIS 227492 (S.D. Tex. Dec. 19, 2022)............ 26

*Colorado v. United States EPA*,
  989 F.3d 874 (10th Cir. 2021) ................................................................................................ 10

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp*.,
  356 F.3d 1256 (10th Cir. 2004) .............................................................................................. 11

*Elevate Fed. Credit Union v. Elevations Credit Union*,
  67 F.4th 1058 (10th Cir. 2023) .......................................................................................... 32, 34

*Equitable Nat'l Life Ins. Co.*,
  434 F. Supp. 3d 1227 (D. Utah 2020)................................................................................ 19, 36

*Gen. Motors Corp. v. Urban Gorilla, LLC*,
  500 F.3d 1222 (10th Cir. 2007) .......................................................................................... 9, 35

*Glow Indus. v. Lopez*,
  252 F. Supp. 2d 962 (C.D. Cal. 2002) .................................................................................... 33

*Grubhub Inc. v. Kroger Co.*,
  Case No. 1:21-cv-05312, 2022 U.S. Dist. LEXIS 130009 (N.D. Ill. May 25, 2022)......... 20, 23

*GTE Corp. v. Williams*,
  731 F.2d 676 (10th Cir. 1985) ................................................................................................ 11

*GTE Corp. v. Williams*,
  904 F.2d 536 (10th Cir. 1990) ................................................................................................ 33

*Harlem Wizards Entm't Basketball, Inc. v. NBA Props.*,
  952 F. Supp. 1084 (D.N.J. 1997) ................................................................................ 22, 25, 32

*Heartsprings, Inc. v. Heartspring, Inc.*,
  143 F.3d 550 (10th Cir. 1998) ............................................................................ 24, 26, 31, 32

*Hornady Mfg. Co. v. Doubletap, Inc.*,
  746 F.3d 995 (10th Cir. 2014) .................................................................................................. 21

*Instructure, Inc. v. Canvas Techs, Inc.*,
  No. 2:21-CV-00454-DAK-CMR, 2022 U.S. Dist. LEXIS 2822 (D. Utah Jan. 5, 2022) ... 19, 22

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*,
  828 F.2d 1482 (10th Cir. 1987) ......................................................................................... 24, 31

*Keybank Nat'l Ass'n v. Williams*,
  No. 20-1384, 2022 U.S. App. LEXIS 3701 (10th Cir. Feb. 10, 2022) ..................................... 36

*King of the Mt. Sports, Inc. v. Chrysler Corp.*,
  185 F.3d 1084 (10th Cir. 1999) ......................................................................................... 17, 19

*Koninklijke Philips Elecs. N.V. v. Hunt Control Sys.*,
  Civil Action No. 11-3684 (SRC)(CLW), 2017 U.S. Dist. LEXIS 138374 (D.N.J. 2017) ....... 23

*Krueger Int'l, Inc. v. Nightingale Inc.*,
  915 F. Supp. 595 (S.D.N.Y. 1996) .......................................................................................... 16

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)...................................................................................................................... 9

*Native Ecosystems Council v. Webber*,
  CV 25-25-M-DLC, 2025 U.S. Dist. LEXIS 109961 (D. Mont. June 10, 2025)....................... 16

*Nature's Life, Inc. v. Renew Life Formulas, Inc.*,
  No. 2:05cv162, 2006 U.S. Dist. LEXIS 1458 (D. Utah Jan. 9, 2006)................................ 17, 19

*Network Automation, Inc. v. Advanced System Concepts*,
  638 F.3d 1137 (9th Cir. 2011) .................................................................................................. 26

*Nina Ricci, S.A.R.L. v. Gemcraft, Ltd.*,
  612 F. Supp. 1520 (S.D.N.Y. 1985) ........................................................................................ 17

*Packerware Corp. v. Corning Consumer Prods., Inc.*,
  895 F. Supp. 1438 (D. Kan. 1995)...................................................................................... *passim*

*Prime Media, Inc. v. Primedia, Inc.*,
  33 F. Supp. 2d 932 (D. Kan. 1998)..................................................................................... *passim*

*Progressive Distrib. Servs. v. UPS, Inc.*,
    856 F.3d 416 (6th Cir. 2017) ......................................................................................... 20, 31

*Route App., Inc. v. Heuberger*,
    No. 2:22-CV-291-TS-JCB, 2022 U.S. Dist. LEXIS 133506 (D. Utah July 26, 2022)............. 11

*Sally Beauty Co. v. Beautyco, Inc.*,
    304 F.3d 964 (10th Cir. 2002) ................................................................................................ 22

*Sara Lee Corp. v. Sycamore Family Bakery*,
    No. 2:09CV523DAK, 2009 U.S. Dist. LEXIS 100554 (D. Utah Oct. 27, 2009) ..................... 22

*Schrier v. Univ. of Colo.*,
    427 F.3d 1253 (10th Cir. 2005) ............................................................................................9-11

*Strange Music, Inc. v. Strange Music, Inc.*,
    326 F. Supp. 2d 481 (S.D.N.Y. 2004) .................................................................................... 19

*Streamline Production Systems, Inc. v. Streamline Mfg., Inc.*,
    851 F.3d 440 (5th Cir. 2017) .................................................................................................. 21

*Streetwise Maps v. VanDam, Inc.*,
    159 F.3d 739 (2d Cir. 1998) ................................................................................................... 19

*UFirst Fed. Credit Union v. Univ. First Fed. Credit Union*,
    No. 2:22-cv-00646-JNP-JCB, 2023 U.S. Dist. LEXIS 173436 (D. Utah Sep. 27, 2023) . 10, 33,
    34, 36

*Underwood v. Bank of Am. Corp.*,
    996 F.3d 1038 (10th Cir. 2021) .............................................................................................. 33

*Union Carbide Corp. v. Ever-Ready, Inc.*,
    531 F.2d 366 (7th Cir. 1976) .................................................................................................. 22

*Universal Money Ctrs, Inc. v. AT&T*,
    22 F.3d 1527 (10th Cir. 1994) ............................................................................... 19, 20, 24, 32

*Universal Money Ctrs, Inc. v. AT&T*,
    797 F. Supp. 891 (D. Kan. 1992), *aff'd*, 22 F.3d 1527 (10th Cir. 1994) .................................. 27

*Water-Pik, Inc. v. Med-Systems, Inc.*,
    726 F.3d 1136 (10th Cir. 2013) .................................................................................. 22, 23, 24

*Worthington Foods, Inc. v. Kellogg Co.*,
    732 F. Supp. 1417 (S.D. Ohio 1990) ..................................................................................... 32

*Wreal, LLC v. Amazon.com, Inc.*,
    38 F.4th 114 (11th Cir. 2022) ................................................................................................. 20

*Wreal, LLC v. Amazon.com, Inc.*,
   No. 14-21385-CIV-LENARD/GOODMAN, 2016 U.S. Dist. LEXIS 192613 (S.D. Fl. Jan. 7,
   2016) ...................................................................................................................................... 22-23

## Statutes

15 U.S.C. § 1116(a) ...................................................................................................................... 11

## Other Authorities

Fed. R. Civ. P. 65(c) ..................................................................................................................... 36

## I. INTRODUCTION[1]

Defendant, a supplier of "top shelf," "highly durable" hockey bags, Dkt. 30, ¶¶ 5, 42, sold under the designation "Mammoth Hockey," asks the Court to preliminarily enjoin Plaintiffs, which operate a National Hockey League ("NHL") team, from using the trademark UTAH MAMMOTH and the following logo with which that trademark often appears:



("Logo"; collectively, "UTAH MAMMOTH Marks"). Defendant asserts that buyers of its bags will be confused by these Marks, causing irreparable harm to its business, in violation of its alleged trademark rights.

Although Defendant never acknowledges this, the relief it seeks is a disfavored, mandatory preliminary injunction that is unavailable unless it establishes a "strong showing" of entitlement to relief. Defendant's requested injunction is mandatory because it would require Plaintiffs and their licensees, sponsors, media rightsholders and others to recall merchandise, remove countless digital and physical assets, redo center ice at the team's Delta Center and practice rinks, all during the NHL season. Armstrong Dec., ¶¶ 26, 45-53, 55-77, 84-86. No basis for such a disfavored injunction exists for many reasons, including lack of irreparable harm. As a result, the Court should deny Defendant's Motion in its entirety.

---

[1] The facts set forth herein are taken from the accompanying Declarations of Christopher Armstrong, John Ballard Larson, Dr. Itamar Simonson, Frank Kelly and Jessica Groen.

## II.    BACKGROUND

With great fanfare in May 2024, Plaintiffs announced UTAH MAMMOTH as a potential team name, among other possibilities. *Id.*, ¶¶ 11-13. Shortly afterward, Defendant posted on Facebook that it was "partial" to that selection. *Id.*, ¶¶ 4, 36. Over the next year, Plaintiffs invited their fans to vote on the team's name as part of a highly publicized selection process. *Id.*, ¶¶ 11, 17. During that time, multiple third parties contacted Plaintiffs about potential names under consideration. Some, like Yeti Coolers, owner of YETI trademarks, affirmatively objected to the possibility of UTAH YETIS as a team name. *Id.*, ¶¶ 28-29. Defendant, however, did not voice any concern despite being aware UTAH MAMMOTH was a frontrunner. To the contrary, in April 2025, after UTAH MAMMOTH emerged as a fan favorite, Defendant contacted Plaintiffs and said how "cool" it would be for the parties to work together. *Id.*, ¶¶ 38-40. Then, in June 2025 – more than a year after publicly professing it was "partial" to UTAH MAMMOTH – Defendant first voiced its purported objection. It then delayed nearly two more months after this suit was initiated to file this Motion, knowing the NHL season was imminent. Defendant's prolonged delay in seeking urgent relief is inconsistent with its claims of irreparable harm.

There is no likelihood of success on the merits either, because confusion between the parties' marks is unlikely. Dr. Simonson, one of Plaintiffs' witnesses, is a marketing expert whose work many courts have credited. Simonson Report, ¶¶ 1-12. He used a "gold standard" methodology to conduct a survey of relevant consumers. *Id.*, ¶¶ 14-16, 24. That survey shows that only ***-0.7%*** of respondents were confused, *id.*, ¶¶ 27-33 – a percentage so low it is compelling evidence confusion is unlikely. Other evidence validates this result: the parties' marks are dissimilar when viewed in their entireties and in their marketplace context; and the trade channels in which the parties' goods travel are different, as are the price points at which

they are sold. Defendant's alleged common law trademark rights are also insufficient to obtain the sweeping relief it seeks, given its complete failure to establish sufficient market penetration.

As for Defendant's claim that if use of the UTAH MAMMOTH Marks continues, Plaintiffs will saturate the market, Dkt. 29 at 3, the market is already awash with third-party "Mammoth" branded bags and sports services, as shown immediately below and *infra* at pp. 27-30:

**Mammoth Amateur Hockey Association**





**Boji Mammoths**




ABOUT    PROGRAMS    TOURNAMENTS    SCHEDULE    TEAMS    RESOURCES

# HIGH SCHOOL HOCKEY









### 2025-2026 SEASON

**QUESTIONS? CONTACT:**
Brad Shumway, Hockey Director

*REQUIREMENT:* Each Player must register first with
USA Hockey and then return to this Registration
Session to signup for the 2025-2026 Season.

*IMPORTANT:* Please review the information on the
"Your Account on Crossbar" page before registering
your player. Your parent account needs to be
established first and you can add the youth player as
a participant to that account. Do not establish a
separate account in the youth player's name.

**REGISTER**



**Amherst College Mammoths**







**National Lacrosse League – Colorado Mammoth**



**Westside Woolly Mammoths Baseball**




**Moon Mammoths**



**Mammoth Inc.**





**Mammoth Event Corporation**



Kelly Dec., ¶¶ 13, 16-17. 19-21, Exhs. 9, 13-14, 19, 22-23, 25, 27, 29-30, and 32; Groen Dec.,

Exhs. 1-3.  There is no reason Defendant and Plaintiffs cannot coexist as Defendant does with

these other "Mammoth" trademarks.

To distract the Court from its weak claims, Defendant disparages Plaintiffs with

hyperbolic attacks, accusing them of: "bad faith" and "theft," Dkt. 29 at 4, 18; "conceal[ing]"

their plans to adopt UTAH MAMMOTH for use with "cheaply made hockey bags," *id.* at 3, 18;

and running an "inept selection process" for the team name. *Id.* at 23.  None of this is true.  In

reality, Plaintiffs adopted their Marks after completing a painstaking process with counsel, in

which many trademark searches were run. Armstrong Dec., ¶ 13. In the end, and after analyzing the crowded field of "Mammoth" marks, Plaintiffs concluded in good faith that the UTAH MAMMOTH Marks were available for use for their goods and services. *Id.*, ¶¶ 13, 22, 30.

Defendant, rather than continuing to sell high-quality bags, has launched a misguided, inflammatory effort to halt the use of trademarks that now mean so much to Plaintiffs' fans and Utah, and to force a burdensome and costly rebrand. Indeed, Defendant's delay in objecting to use of the UTAH MAMMOTH Marks means this case is being heard as the 2025-26 NHL season has begun, and such Marks are now entrenched as the team's identity. *Id.*, ¶¶ 18, 42-43, 90. To grant the relief Defendant seeks would inflict substantial and irreparable damage on the team – both financial and reputational. *Id.*, ¶¶ 5, 52, 58, 77, 86; Larson Dec., ¶¶ 4-8. In contrast, Defendant offers only conclusory claims of potential harm. Defendant isn't entitled to any relief in this action, and certainly not a disfavored, mandatory preliminary injunction.

## III.    LEGAL STANDARD

Although Defendant's Motion recites the elements it must prove to obtain a preliminary injunction – (1) irreparable harm; (2) substantial likelihood of success on the merits; (3) a threatened injury to Defendant that outweighs the harm to Plaintiffs; and (4) that the injunction, if issued, will not adversely affect the public interest – *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) – Defendant omits relevant points. For example, Defendant never mentions that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted; emphasis in original); *accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

Defendant also never acknowledges that, while **any** preliminary injunction is extraordinary, the Tenth Circuit has held that mandatory preliminary injunctions are

disfavored. *See Colorado v. United States EPA*, 989 F.3d 874, 883-84 (10th Cir. 2021) (citation omitted). When a mandatory preliminary injunction is sought, "the movants must 'make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.'" *Are You Listening Yet PAC v. Henderson*, No. 2:24-CV-00104-JNP, 2024 U.S. Dist. LEXIS 42750, at \*12 (D. Utah Mar. 11, 2024) (citation omitted). And, the trial court is "required to scrutinize the requested injunction 'more closely' . . . to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Blendtec Inc. v. BlendJet Inc.*, No. 2:25-cv-00096-RJS-DPB, 2025 U.S. Dist. LEXIS 183632, at \*24 (D. Utah Sep. 17, 2025) (citation omitted).

Defendant's relief is a disfavored, mandatory preliminary injunction because it would "affirmatively require [Plaintiffs] to act in a particular way, and as a result . . . place the issuing court in a position where it may have to provide ongoing supervision to assure [Plaintiffs are] abiding by the injunction." *Schrier*, 427 F.3d at 1261; *see Blendtec*, 2025 U.S. Dist. LEXIS 183632, at \*24-25 (D. Utah Sep. 17, 2025) (requested injunction that would have required Defendants to "change their packaging, website, and advertisements, and . . . recall goods that are currently for sale" deemed mandatory and disfavored); *UFirst Fed. Credit Union v. Univ. First Fed. Credit Union*, No. 2:22-cv-00646-JNP-JCB, 2023 U.S. Dist. LEXIS 173436, at \*9-10 (D. Utah Sep. 27, 2023) (same).[2]

---

[2] Defendant also inconsistently describes the relief it seeks. It argues for "an Order enjoining Plaintiffs from any and all uses of the Accused Mark and Logo," but also seeks to enjoin Plaintiffs "from marketing and selling hockey-related goods, apparel and accessories, including hockey bags, bearing the mark UTAH MAMMOTH . . . and accompanying logo of a mammoth's head . . . in forty-seven states, including Utah . . . ." Dkt. 29 at 1, 26. Regardless of the shifting-sands relief sought, Defendant has not carried its substantial burden of showing entitlement to a disfavored, mandatory preliminary injunction.

## IV. ARGUMENT

### A. Defendant Has Not Made a Strong Showing of Irreparable Harm

A "'showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" *Blendtec*, 2025 U.S. Dist. LEXIS 183632, at \*25-26 (quoting *Schrier*, 427 F.3d at 1268). Indeed, a movant "must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Blendtec*, 2025 U.S. Dist. LEXIS 183632, at \*26 (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 356 F.3d 1256, 1260 (10th Cir. 2004)). Here, Defendant asserts that irreparable harm is presumed under 15 U.S.C. § 1116(a) because it is likely to succeed on the merits of its trademark claims. Dkt. 19 at 24. However, Defendant's cited statutory presumption is rebuttable, 15 U.S.C. § 1116(a), including through evidence of delay.

A party's delay in seeking urgent relief "undercuts any presumption that infringement alone has caused irreparable harm [and] such delay may justify denial of a preliminary injunction for trademark infringement." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1985). For example, in *Packerware Corp. v. Corning Consumer Prods., Inc.*, 895 F. Supp. 1438, 1452 (D. Kan. 1995), the plaintiff learned of the defendant's use of the allegedly infringing mark in January 1995, but waited until March 1995 to file a complaint, and until April 1995 to seek preliminary relief. "While the time is relatively short, under the circumstances, with [defendant] initiating an intensive product launch, a delay of even a few months weighs against a claim that urgent relief is warranted." *Id.*; *see also Route App., Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 U.S. Dist. LEXIS 133506, at \*8-9 (D. Utah July 26, 2022) (three-month delay undermined claim of irreparable harm).

Here, Defendant's inordinate, highly prejudicial delay in filing its Motion is fatal to its claim of irreparable harm. UTAH MAMMOTH was announced as a potential team name in

May 2024, Armstrong Dec., ¶ 11, and included in three fan surveys seeking feedback on such names between then and February 2025. *Id.*, ¶¶ 11, 14. Defendant knew UTAH MAMMOTH was under consideration no later than June 7, 2024, when it posted on Facebook that, of the proposed names, "[w]e're pretty partial to [the Utah Mammoth name]," –accentuated with a playful winking emoji – and circled "Mammoth."



*Id.*, ¶ 36.

Defendant's co-owner, Erik Olson, claims his post was "certainly not in any way an offer to Plaintiffs to take and use our Company's Mark and Logo," Dkt. 30, ¶ 44, but he misses the

point.  Plaintiffs did not take his designations; they created their own dissimilar mark and logo.

His post was also "certainly not" an objection to Plaintiffs' consideration of UTAH

MAMMOTH as a team name – an objection other parties made.  Armstrong Dec., ¶¶ 28-29.

Indeed, unlike those third parties, it is undisputed that Defendant said nothing to protest

Plaintiffs' consideration of UTAH MAMMOTH for a full year, further telling Plaintiffs in April

2025 how "cool" it would be for the parties to collaborate if UTAH MAMMOTH were selected:



Armstrong Dec., ¶ 38.  Ten days later, Plaintiffs responded to Defendant's overture:



Armstrong Dec., ¶¶ 40-41.  Olson then lightheartedly responded with "[s]ounds good to me.

Have a great weekend!" – hardly the tone of an aggrieved trademark owner:



Incredibly, Defendant mischaracterizes Plaintiffs' response as a "tacit acknowledgement that [Plaintiffs] understood they could not use the Mark and Logo without first speaking with Defendant." Dkt. 29 at 24. To be charitable, the response in no way supports this proposition. It wasn't until June 10, 2025 – twelve months *after* Plaintiffs first announced their consideration of UTAH MAMMOTH – that Defendant, through counsel, first objected. Dkt. 31-23.

To the extent Defendant now claims this year-long delay is excusable because it "had not been following the news around Plaintiffs' name selection process on a regular basis," Dkt. 30, ¶ 48, this assertion is both insufficient and deeply revealing about Defendant's lack of concern

regarding the adoption of UTAH MAMMOTH.  In *Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F. Supp. 595, 611-12 (S.D.N.Y. 1996), then-District Judge Sotomayor denied preliminary injunctive relief to a plaintiff that learned of a prototype of an allegedly infringing product nine months before filing suit, but made no claim of infringement until later.  *Id.* at 613 ("I decline to manufacture a sense of urgency that is not supported by plaintiff's own conduct."); *see also Nina Ricci, S.A.R.L. v. Gemcraft, Ltd.*, 612 F. Supp. 1520, 1530-31 (S.D.N.Y. 1985) (denying preliminary injunction to plaintiff that merely sent a single protest letter during a five-month period that included its busiest selling season; "this hardly evinces the tenacity with which one would expect an irreparably injured party to press its claims . . .").

And the period of delay went on well past June 10, 2025, to Plaintiffs' extreme prejudice. After Plaintiffs responded to Defendant's June 10 demand on June 23, Dkt. 31-24, Defendant delayed over a month writing back.  Dkt. 31-25.  Defendant's counsel claims he was busy with another case, Dkt. 31, ¶ 29. This excuse is insufficient given that five attorneys from the same firm represent Defendant in this case, and the July 31 response was two pages long.  *See Native Ecosystems Council v. Webber*, CV 25-25-M-DLC, 2025 U.S. Dist. LEXIS 109961, at *20-21 (D. Mont. June 10, 2025) ("Counsel's busy schedule does not negate the impression that if the need for a preliminary injunction had been deemed essential . . . counsel would have found the time.").  Moreover, Defendant's July 31 letter asked that Plaintiffs' counsel "confirm if you will accept service of a complaint on behalf of your client." Dkt. 31-25 at 2.  Yet Defendant did not file this Motion until September 25, nearly two months later.  Dkt. 28, 29.

During the long period in which Defendant failed to request relief, Plaintiffs invested millions launching UTAH MAMMOTH as the newest member of the NHL.  Larson Dec., ¶ 4. Just weeks ago, the 2025-26 NHL season began.  The team and its fans, licensees and sponsors

are now fully invested in the UTAH MAMMOTH Marks and the substantial goodwill they represent. *Id.*, ¶¶ 6, 8. By waiting so long, Defendant has exposed Plaintiffs and others to tremendous monetary and reputational risks to which they would not otherwise have been subjected. As a result, Defendant has forfeited any claim of irreparable harm, and any entitlement to expedited relief. *See Nature's Life, Inc. v. Renew Life Formulas, Inc.*, No. 2:05cv162, 2006 U.S. Dist. LEXIS 1458, at \*20-21 (D. Utah Jan. 9, 2006) (nine-month delay from initial notice of new planned design precluded preliminary injunction).

**B.    Defendant Has Not Shown a Strong Likelihood of Success on the Merits**

**1.    There Is No Strong Showing of Likely Reverse Confusion**

Defendant's theory of purported confusion has been inconsistent since this dispute arose. In its pre-litigation correspondence, Defendant claimed it was "well known as a high-quality source of hockey-related goods," and that Plaintiffs' use of UTAH MAMMOTH (but ***not*** the Logo) would cause consumers to believe incorrectly that "your company is somehow related to or endorsed, licensed, sponsored, or otherwise associated with Mammoth Hockey." Dkt. 31-23 at 1. This is an allegation of "forward confusion," where consumers believe that a junior user's products emanate from the senior user. *See Altira Grp. LLC v. Philip Morris Co.*, 207 F. Supp. 2d 1193, 1197 (D. Col. 2002). However, Defendant dropped that theory to argue instead that there is a likelihood of "reverse confusion," *i.e.* that consumers will assume Defendant's hockey bags emanate from Plaintiffs because Plaintiffs have saturated the market with ***both*** UTAH MAMMOTH Marks. *Id.*; Dkt. 29 at 3. The changing nature of Defendant's claims betrays their weakness, as confirmed by a review of the six factors Tenth Circuit courts consider in assessing likely confusion. *See King of the Mt. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089-90 (10th Cir. 1999) (enumerating factors).

a. <u>The Parties' Marks, Viewed in Their Entireties, Are Dissimilar</u>

According to Defendant, because the parties' marks both use "Mammoth" accompanied by stylized mammoth logos, they are "extremely similar" in terms of sight, sound and meaning. Dkt. 29 at 15-17.  Defendant even argues that similarity is "often dispositive" of likely confusion, *id.*, although no Tenth Circuit cases say that, and district courts have found no likely confusion, even when marks are similar.  *See, e.g.*, *Altira*, 207 F. Supp. 2d at 1198-99 (ALTIRA and ALTRIA similar in terms of sight, sound and meaning, but confusion unlikely; preliminary injunction denied); *Prime Media, Inc. v. Primedia, Inc.*, 33 F. Supp. 2d 932, 937-38 (D. Kan. 1998) (PRIME MEDIA and PRIMEDIA similar but confusion unlikely; denying preliminary injunction).

Here, when the parties' marks are compared in their entireties, as they appear in the marketplace, there are three notable differences that any reasonable consumer would see, hear, and understand, as shown below:





First, UTAH precedes MAMMOTH in Plaintiffs' mark, creating significant differences in appearance, pronunciation and meaning.  Defendant's claim that UTAH is irrelevant because it is geographically descriptive, Dkt. 29 at 15, is incorrect.  Through extensive use, advertising, and publicity, UTAH as used in UTAH MAMMOTH has achieved trademark significance for

the team – just like the UTAH component of UTAH HOCKEY CLUB, the trademark Plaintiffs used for the team's first season. Groen Dec., ¶ 7, Exh. 4. The U.S. Patent & Trademark Office (the "PTO") found that UTAH had acquired trademark significance, and issued four UTAH HOCKEY CLUB registrations without requiring a disclaimer of UTAH. *Id.* Even if UTAH lacked independent trademark significance, which is not the case, the term cannot be excluded when comparing the parties' marks, just like HOCKEY in Defendant's designation must be considered. *Universal Money Ctrs, Inc. v. AT&T*, 22 F.3d 1527, 1530 (10th Cir. 1994) (to exclude disclaimed terms like MONEY from comparison of parties' marks would be erroneous).

Second, both parties use logos that are so dramatically different that Defendant failed to object to Plaintiffs' Logo in its pre-litigation correspondence. Dkt. 31-23, 31-25. *See Nature's Life*, 2006 U.S. Dist. LEXIS 1458, at *20-21 (respective sun designs not similar).[3] When marks are accompanied by different designs, confusion is less likely. *See Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998).

Third, the parties' marks look different – they use different colors, fonts and other elements that create distinctly different impressions. *King of the Mt. Sports*, 185 F.3d at 1090-91; *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 490-91 (S.D.N.Y. 2004). In contrast, in one of Defendant's cases, *Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d 1227, 1246 (D. Utah 2020), the parties' marks were graphically similar and consisted almost entirely of the

---

[3] The logos deemed similar in one of Defendant's cases, *Instructure, Inc. v. Canvas Techs, Inc.*, No. 2:21-CV-00454-DAK-CMR, 2022 U.S. Dist. LEXIS 2822, at *35 (D. Utah Jan. 5, 2022), were far closer than those here, as shown below:



word "Equitable."  So, here, the parties' marks are dissimilar when viewed in their marketplace context.[4]

        b.   The Intent Factor Favors Plaintiffs

The Tenth Circuit has not addressed how confusion should be assessed in a reverse confusion case since 1994, when it decided *Universal Money Ctrs*. and treated all factors the same as in a case of forward confusion.  *Id.*, 22 F.3d at 1529-36.  In forward confusion cases, if a junior user adopts its mark with the intent to misappropriate the senior user's goodwill, such intent may weigh in favor of likely confusion.  *Id.* at 1531-32.  If this Court treats the intent factor in this manner, then no evidence exists to substantiate Plaintiffs' adoption of the UTAH MAMMOTH Marks to benefit from Defendant's alleged goodwill.  Armstrong Dec., ¶¶ 31-37.

Instead, Defendant argues that intent in a reverse confusion case considers whether the junior user intended to flood the marketplace and thereby harm the senior user, as occurred in *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 136-37 (11th Cir. 2022), or behaved in a careless manner, disregarding the senior user's rights.  Dkt. 29 at 17-19.  According to Defendant, Plaintiffs acted in bad faith by never contacting Defendant during the name selection process;

---

[4] The conclusion that the marks' dissimilarities outweigh their similarities is not altered, as Defendant would have the Court believe, by PTO office actions issued against other trademarks Plaintiffs considered adopting, like UTAH YETIS and UTAH VENOM, that included no logos or graphic elements.  Dkt. 31, ¶¶ 11-13; Dkt. 31-9, 31-10, 31-11, 31-12; Dkt. 29 at 2, 7-8.  All such office actions were non-final registration refusals, issued by examining attorneys, that represented preliminary findings by those attorneys. *Progressive Distrib. Servs. v. UPS, Inc.*, 856 F.3d 416, 426-27 (6th Cir. 2017).  Many courts have recognized that the evidentiary value of such office actions is negligible, in part because the PTO considers issues only of registration, not use, *Prime Media*, 33 F. Supp. 2d at 938, and in part because examining attorneys do not have access to the marketplace evidence courts consider when use is at issue.  *Packerware*, 895 F. Supp. at 1449; *Grubhub Inc. v. Kroger Co.*, Case No. 1:21-cv-05312, 2022 U.S. Dist. LEXIS 130009, at *10-11 (N.D. Ill. May 25, 2022).

concealing adoption of the UTAH MAMMOTH Marks; ignoring the potential for confusion; and stealing Defendant's purported rights.  *Id.*[5]

Regardless of the standard the Court applies, Defendant's vitriolic allegations of ill intent are unfounded.  Plaintiffs first considered adopting UTAH MAMMOTH because the name communicated an image of strength, powerful momentum and wintery imagery, and as a nod to Utah's rich paleontological history.  Armstrong Dec., ¶¶ 20-22.  Preliminary searches were undertaken before any applications were filed at the PTO, *id.*, ¶ 13.  After initial rounds of fan voting showed that UTAH MAMMOTH was a popular potential selection, full searches were run.  *Id.*  Plaintiffs were aware of Defendant, but also myriad other parties using "Mammoth" for bags and sports services, and all peaceably coexisting in the marketplace.  *Id.*, ¶ 32; Kelly Dec., Exhs. 3-33; Groen Dec., Exhs. 1-3.  In light of such coexistence; Defendant's failure to object to Plaintiffs' potential selection of UTAH MAMMOTH (unlike other parties that did object); and Defendant's message that it would be "cool" if the parties could collaborate, Plaintiffs decided in good faith that obtaining prior consent from Defendant was unnecessary to use UTAH MAMMOTH.  Armstrong Dec., ¶¶ 38-41.

Based on this, one of Defendant's own cases show Plaintiff's actions do not demonstrate wrongful intent sufficient to support a disfavored, mandatory preliminary injunction.  *See e.g., Altira*, 207 F. Supp. 2d at 1200-01 ("Philip Morris conducted a thorough search after selecting

---

[5] Defendant also argues that Plaintiffs' refusal to cease use of the UTAH MAMMOTH Marks in response to their long-delayed objections was bad faith. Dkt. 29 at 18-19.  However, a party's refusal to capitulate to an unfounded demand letter like those Defendant sent is not evidence of bad faith.  *See Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014); *Streamline Production Systems, Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 456 (5th Cir. 2017) ("the majority rule amongst jurisdictions is that a defendant's continued use of a mark even after it receives a cease and desist letter cannot be construed as evidence of intent to confuse") (citation omitted).

the name ALTRIA and that its counsel made a good faith effort to determine whether "ALTRIA" would conflict with the mark protected by Altira Group. There is no indication of carelessness."); *see also Prime Media*, 33 F. Supp. 2d at 939 (mere knowledge of a senior mark insufficient to favor a movant in reverse confusion case); *Harlem Wizards Entm't Basketball, Inc. v. NBA Props.*, 952 F. Supp. 1084, 1098-99 (D.N.J. 1997) (no evidence of carelessness when trademark searches were conducted and counsel was consulted before change of professional basketball team name). Defendant's other highly distinguishable cases are not to the contrary. *See Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 973 (10th Cir. 2002) (defendant told third party in writing that it "want[ed] to knock-off" plaintiff's line); *Instructure*, 2022 U.S. Dist. LEXIS 2822, at \*35-36 (evidence showed junior user rebranded to take advantage of senior user's goodwill); *Sara Lee Corp. v. Sycamore Family Bakery*, No. 2:09CV523DAK, 2009 U.S. Dist. LEXIS 100554, at \*9-10 (D. Utah Oct. 27, 2009) (defendant sold GRANDMA SYCAMORE'S trademarks to plaintiff's predecessor, then adopted SYCAMORE FAMILY BAKERY).

### c. There Is No Competent Evidence of Actual Confusion, and Plaintiffs' Survey Evidence Shows Confusion Is Unlikely

Evidence of actual confusion (or lack thereof) generally takes two forms: (1) consumer surveys; and (2) anecdotal instances of real-world confusion. *Water-Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1144-51 (10th Cir. 2013). Here, Plaintiffs have offered the Simonson survey demonstrating that confusion is unlikely. Defendant has mustered only a handful of purported instances of actual confusion that are insufficient as a matter of law.

In reverse confusion cases, the "gold standard" for surveys is the "*Eveready*" design used in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 375 (7th Cir. 1976). *See Wreal, LLC v. Amazon.com, Inc.*, No. 14-21385-CIV-LENARD/GOODMAN, 2016 U.S. Dist. LEXIS

192613, at \*30 (S.D. Fl. Jan. 7, 2016).  When an *Eveready* survey is conducted in a reverse confusion case, the senior user's customers are shown either a test stimulus depicting its mark as it appears in the marketplace, or a control stimulus to identify the percentage of persons whose "confused" responses are attributable to factors other than what is being tested.  *See Grubhub*, 2022 U.S. Dist. LEXIS 130009, at \*5-9; *Koninklijke Philips Elecs. N.V. v. Hunt Control Sys.*, Civil Action No. 11-3684 (SRC)(CLW), 2017 U.S. Dist. LEXIS 138374, at \*105-112 (D.N.J. 2017); *Wreal*, 2016 U.S. Dist. LEXIS 192613, at \*28-41.  The percentage of "confused" responses in the control cell is deducted from the "confused" responses in the test cell to arrive at a calculation of "net confusion."  *Water-Pik*, 726 F.3d at 1148-49.  A net confusion percentage below 10% is generally viewed as proof that confusion is unlikely.  *Id.*; *Grubhub*, 2022 U.S. Dist. LEXIS 130009, at \*5.

Here, the Simonson survey was conducted among 317 consumers – 159 in a test cell and 158 in a control cell.  Simonson Report, ¶ 14.  To participate, all respondents confirmed that they or a member of their household participated in hockey, and that they expected to purchase within the next year, through a manufacturer's online store, a "premium, durable hockey bag to store and transport hockey equipment that costs at least $100" – the base price point for Defendant's bags.  *Id.*, ¶¶ 24, 28; Groen Dec., Exh. 5.  Upon qualifying, all respondents in both cells were asked questions used in *Eveready* surveys, Simonson Report., ¶¶ 19-25, and shown either a test stimulus depicting Defendant's bags as they appear in the marketplace with other context from Defendant's website, *id.*, ¶¶ 25-26, Exh. E, or a control stimulus in which "Mammoth" was replaced with "Mastodon."  *Id.*, ¶¶ 25-26, Exh. E.  Only 6.3% of respondents in the test cell gave answers suggesting they might be confused, while only 6.9% of control cell respondents gave such answers, for a net confusion percentage of -.07%.  *Id.*, ¶¶ 30-32, Exh. F.  Based on this, Dr.

Simonson has opined that confusion is unlikely. *See Water-Pik*, 726 F.3d at 1148-49; *Universal Money Ctrs*, 22 F.3d at 1534-36.

Against this compelling evidence of a lack of likely confusion from a respected expert, Simonson Report, ¶¶ 30-33, Defendant offers nothing that should dissuade the Court from weighing this factor strongly in Plaintiffs' favor. Defendant's evidence of actual confusion consists of: (1) a Reddit post, Dkt. 31-26 at 5, that is not an example of actual confusion – its author clearly understood the parties' goods and services are different and simply commented on this action; and (2) two conversations in which Olson's acquaintances allegedly asked if his "Mammoth Hockey" goods came from Plaintiffs. Dkt. 30, ¶¶ 51-53. Such inquiries are not evidence of likely confusion, *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir. 1998); *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987), and Tenth Circuit courts have repeatedly held that a handful of instances of purported actual confusion, unrelated to purchasing decisions, are *de minimis* and entitled to no weight. *Water-Pik*, 726 F.3d at 1150 ("We have consistently recognized, however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis."); *Universal Money Ctrs*, 22 F.3d at 1535-36; *Prime Media*, 33 F. Supp. 2d at 939-40; *Packerware*, 895 F. Supp. at 1451 (characterizing as "meager" testimony that "some personal friends of [plaintiff's founder] were confused and asked about the two products").

Defendant also argues that, before the May 2025 announcement, internet searches for "mammoth hockey bags" listed Defendant's website first, Dkt. 30, ¶ 23, but now UTAH MAMMOTH hockey bags are prominently displayed. Dkt. 29 at 19. But no documentation is offered to show search results predating the adoption of the UTAH MAMMOTH Marks, and Defendant's internet search results show that Defendant's website is correctly and prominently

featured. Dkt. 31-20, 31-21. Since internet search results change over time and can vary depending on the searcher's location and viewing history, as shown by the differing search results Plaintiffs have submitted, Groen Dec., Exhs. 6-8, Defendant's search engine evidence proves nothing, and certainly not confusion. Google Trends data also shows that, outside Utah, searches for "utah mammoth" and "mammoth hockey bags" are trivial. Groen Dec., Exhs. 7-8. This data demonstrates that Plaintiffs have not displaced Defendant or created the reverse confusion Defendant claims is likely.

d. <u>The Parties' Goods and Marketing Are Not Competitively Proximate</u>

Defendant contends the parties are in direct competition because they supposedly "sell the same products in the same channels – namely hockey-related products, including hockey bags, primarily by Internet advertising and online sales," Dkt. 29 at 20 – so this factor weighs in its favor. This is not so, for several reasons.

First, Defendant does not offer professional hockey, or any other services, nor is there evidence of any ongoing use of Defendant's "Mammoth" designation with goods other than hockey bags and accessories like t-shirts. To pretend, as Defendant does, that this is a case where "two companies sell the same thing under the same name," *id.*, blinks reality. *See Harlem Wizards*, 952 F. Supp. at 1095 ("Plaintiff would have this Court simply lump the services of plaintiff and defendants under the heading of basketball or entertainment and, on that basis alone, find that the parties engage in confusingly similar services. . . . Meaningful differences between the products and services are often cited as a factor tending to negate reverse confusion, even when the products are superficially within the same category.")

Second, as to hockey bags, substantial differences exist between the parties' goods. Defendant's bags were designed to be "top shelf" products with a focus on durability, Dkt. 30, ¶¶ 5, 11; developed after an exhaustive design and manufacturing process, *id.*, ¶¶ 3-5, 8-25; and

25

priced accordingly. Groen Dec., Exh. 5. Indeed, Defendant's bags are so pricey that they sit at the top of the market, *id.*; Dkt. 30-16 at 4 ("my only complaint might be the price of this bag. At $220, it retails for three times as much as a Bauer premium bag"), unlike Plaintiffs' bags, which are less expensive and aimed at a different market segment. Armstrong Dec., ¶ 54; *Heartsprings*, 143 F.3d at 556-57 (where parties "operate[] in distinctly different markets" confusion is less likely); *Casa Tradición S.A. de C.V. v. Casa Azul Spirits, LLC*, Civ. Act. No. H-22-2972, 2022 U.S. Dist. LEXIS 227492, at *27-28 (S.D. Tex. Dec. 19, 2022) (same; preliminary injunction denied).

Third, each party's manner of marketing is different. Plaintiffs target their fans through local and national media, competing with other professional sports teams. Armstrong Dec., ¶ 55. Defendant targets hockey players through its website and social media, competing with other high-end bag makers. Dkt. 30, ¶¶ 35-41. Any overlap between these audiences is negated by purchaser sophistication. Dkt. 29 at 21. The fact that both parties market their products online counts for little. *Network Automation, Inc. v. Advanced System Concepts*, 638 F.3d 1137, 1151 (9th Cir. 2011) ("the district court's determination that because both parties advertise on the Internet this factor weighed in favor of [trademark owner] was incorrect." (grant of preliminary injunction reversed)).

The parties also use different trade channels. While each sells online, Plaintiffs' goods are available through official stores, such as the NHL shop, as well as in physical stores like Smith's and Lids, often in dedicated "team" sections. Armstrong Dec., ¶¶ 45-50. Defendant's goods are sold only through its website. Dkt. 30, ¶ 35. To the extent Defendant asserts that the current separation of the parties' businesses could change based on Defendant's "potential plans to expand its business," Dkt. 30, ¶ 58, such unrealized and undocumented plans are irrelevant in

the absence of evidence that anyone other than Defendant knows of them.  *See Universal Money Ctrs, Inc. v. AT&T*, 797 F. Supp. 891, 895 (D. Kan. 1992), *aff'd*, 22 F.3d 1527, 1933 (10th Cir. 1994); *Packerware*, 895 F. Supp. at 1450.

Finally, for a variety of reasons, Plaintiffs do not use "Mammoth" alone on bags.  As a result, Plaintiffs' bags are less similar to Defendant's bags than other "Mammoth" bags on the market.

**Plaintiffs' Bags:**



**Defendant's Bags:**



Duralite Player Bag
$ 249.00

Wheeled Player Bag
$ 275.00

**Third-Party Bags:**

**Mammoth Amateur Hockey Association**



**Mammoth Mug**



**MammothCooler.com**



**Boji Mammoths**



**Sand Valley**



**Mammoth Track Club**



Armstrong Dec., ¶ 34; Groen Dec., Exh. 5; Kelly Dec., ¶¶ 9-14, Exhs. 3, 5, 14, and 16.

### e. Purchasers of Expensive Hockey Bags Are Likely to Exercise a Significant Degree of Care

Distilled to its essence, Defendant's discussion of the degree of care exercised by purchasers of "top shelf" durable hockey bags is that such purchasers are sophisticated and exercise care in making buying decisions, but the "nearly identical nature" of the parties' marks overrides such expertise and care. Dkt. 30, ¶¶ 5, 11; Dkt. 29 at 21. This is an exercise in wishful thinking. The parties' marks are not "nearly identical," and given the specialized audience for Defendant's pricey bags, this factor does not weigh in its favor. *See Jordache*, 828 F.2d at 1487 ( "[C]ustomers are likely to exercise a high degree of care in purchasing" more expensive clothing); *Packerware*, 895 F. Supp. at 1451.[6]

### f. Defendant's Designation Is Weak

As with the confusion factor concerned with intent, Defendant argues trademark strength should be analyzed differently in reverse confusion cases, Dkt. 29 at 21, even though the Tenth Circuit has not said this, and other Circuits disagree. *See, e.g., Progressive*, 856 F.3d at 430-31. According to Defendant, this factor should favor it because: (i) its use of "Mammoth" is arbitrary, making its mark conceptually strong; and (ii) Defendant's market presence is or will be swamped by Plaintiffs. Dkt. 29 at 13-14, 21.

Even if the Court adopted Defendant's analysis, its arguments would fail. Defendant's use of "Mammoth" is suggestive, not arbitrary. A suggestive mark "requires the consumer to use imagination and perception to determine the product's nature," while an arbitrary mark "has a

---

[6] Defendant's argument that customers will not purchase Defendant's bags because they support teams in competition with Plaintiffs is of no moment. Dkt. 30, ¶ 56. If Defendant was concerned with such issues, it would have challenged Amherst College's well-publicized rebranding to the Amherst Mammoths in 2017 – three years after Defendant's claimed priority date; Kelly Dec., Exh. 21 – for fear of losing sales to supporters of the University of Connecticut or Williams College, both Amherst rivals.

common meaning unrelated to the product for which it has been assigned, such as APPLE when applied to computers." *Heartsprings*, 143 F.3d at 555 (citation and internal quotations omitted). Here, Olson says Defendant chose "Mammoth" "because it signifies strength, endurance and resilience due to the Ice Age animal's size and ability to survive harsh conditions." Dkt. 30, ¶ 6. Plaintiffs selected the UTAH MAMMOTH Marks for similar reasons, Armstrong Dec., ¶ 22, and it is no coincidence others also use "Mammoth" marks for cold weather goods and services. Kelly Dec., Exhs. 9-18, 21-31; Groen Dec., Exhs. 1-2.

Thus, Defendant's use of "Mammoth," is suggestive, not arbitrary. *See Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1074 (10th Cir. 2023) (ELEVATIONS suggestive for credit union services); *Harlem Wizards*, 952 F. Supp. at 1097 (WIZARDS suggestive for basketball services). Because Defendant's "Mammoth" designation is suggestive, it has limited conceptual strength – less than an arbitrary mark. *Heartsprings*, 143 F.3d at 555; *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349-50 (9th Cir. 1979) (a suggestive mark is "less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak mark"); *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1456 (S.D. Ohio 1990) (in reverse confusion case, HEARTWISE was "not, by its inherent nature, a 'strong' mark; it [was] neither fanciful nor arbitrary").

Further, courts consider the extent to which third parties use the mark at issue. *Elevate*, 67 F.4th at 1074-75. The many third parties using "Mammoth," or variations thereof, including stylized logos, with bags and sports teams undermines any conceptual or commercial strength Defendant's designation has, and makes it far less likely that the UTAH MAMMOTH Marks could swamp Defendant in the marketplace. *See* pp. 3-8, 27-30, *supra*; Kelly Dec., Exhs. 3-7, 9-19, 21-31; Groen Dec., Exhs. 1-3. *See Elevate*, 67 F.4th at 1074-75; *Universal Money Ctrs*, 22

F.3d at 1533-34. Because the field of "Mammoth" users for sports and bags is crowded, the likelihood that consumers will encounter Defendant's hockey bags and associate them with Plaintiffs is low. *Glow Indus. v. Lopez*, 252 F. Supp. 2d 962, 991-92 (C.D. Cal. 2002).[7] Accordingly, this factor, like all others, precludes the strong showing of likely confusion necessary to obtain a disfavored, mandatory preliminary injunction.

### 2. Defendant Is Not Entitled to a Nationwide Injunction

Another substantial problem undermines the merits of Defendant's claims: it has not shown that whatever trademark rights it has are sufficient to obtain a nationwide injunction. Defendant owns no federal registration for its "Mammoth" designation, so its claims are premised on alleged common law rights. Dkt. 29 at 12-13. Yet, it seeks a disfavored, mandatory preliminary injunction extending either nationwide, Dkt. 29 at 26, or to forty-seven states. *Id.* at 13. To obtain such relief as a common law user, Defendant must make a strong showing that Plaintiffs adopted the UTAH MAMMOTH Marks in bad faith, or that Defendant penetrated all geographic markets in which it seeks relief before May 7, 2025 – when use of UTAH MAMMOTH began. Armstrong Dec., ¶ 25. *See GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir. 1990); *UFirst*, 2023 U.S. Dist. LEXIS 173436, at *11-17; *Glow Indus.*, 252 F. Supp. 2d at 983-86.[8]

---

[7] The crowded "Mammoth" field distinguishes this case from the hypothetical uses of "Yankees Baseball," "Cowboys Football" and "Celtic Basketball" Defendant references. Dkt. 29 at 17. There is no evidence of any third-party use of "Yankees" "Cowboys" or "Celtic" in a manner that has weakened the well-known source identifiers of these three sports teams. In contrast, as multiple third parties use "Mammoth" for bags, consumers look to more than that word to distinguish the sources of goods and services, making it less likely Plaintiffs' goods and services would be associated with Defendant's designation, as the Simonson survey confirms.

[8] Relying on *Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1045 (10th Cir. 2021), Defendant argues it can establish nationwide rights through a single sale in a particular market. Dkt. 29 at 12. That interpretation of *Underwood* is incorrect, as the *UFirst* decision makes clear. *Id.*, 2023 U.S. Dist. LEXIS 173436, at *18-22 (*Underwood* articulated a standard for establishing a

As set forth, *supra*, on pages 8-9, and 20-22, Defendant has not made a strong showing of Plaintiffs' bad faith.  With respect to market penetration, Defendant has offered no proof – no disclosure of sales of goods bearing its alleged mark by year, product or state; and no disclosure of advertising expenditures or reach.  Dkt. 30, ¶¶ 40-41.  That Defendant operates a website and social media channels (the latter with few followers or subscribers; Dkt. 30-10, 30-11) through which its goods are promoted or sold does not establish market penetration across the U.S. or any state.  *UFirst*, 2023 U.S. Dist. LEXIS 173436, at *16-17 ("market penetration by internet use of a mark should be determined primarily by evidence as to the place where buyers actually purchased the goods and services advertised on the internet site") (citation and internal quotations omitted).  Thus, even if Defendant had carried its heavy burden of showing irreparable harm and likely confusion, its failure to prove the scope of its alleged trademark rights precludes relief.

### C.     The Balance of Hardships Tips Decisively in Plaintiffs' Favor

When it comes to balancing the parties' respective hardships, the call here is not close.  If the Court were to grant relief, the harm to Plaintiffs would be extensive.  Financially, Plaintiffs' losses would exceed $7 million, Larson Dec., ¶¶ 4-5, 7-8, magnified by the losses its licensees, sponsors and others would suffer.  *Id.*, ¶¶ 5-6; Armstrong Dec., ¶¶ 5, 26, 44-47, 55, 59, 68, 73-86.  The effort Plaintiffs and others would have to undertake to comply with an injunction, from recalling goods, erasing all digital uses of UTAH MAMMOTH Marks, removing signs at the team's practice facility and at Delta Center, and repainting the team's rinks, would be extraordinarily burdensome.  Armstrong Dec., ¶¶ 26, 45-53, 55-77, 84-86.  That the 2025-26 hockey season is now underway compounds this harm.  *Id.*, ¶¶ 3, 5, 43, 46-47, 56-58, 86.  As for

protectable interest in a trademark but "did not address the issue of the geographic reach of any service mark rights").

reputational damage, it would be irreparable. Utah's embrace of the UTAH MAMMOTH brand identity steadily grew over the year-long naming process, while Defendant sat by and failed to object, and it has increased since the official launch. *Id.*, ¶¶ 87-93. Consumers have purchased gear and even, in some cases, had portions of the UTAH MAMMOTH Marks tattooed on their bodies. *Id.*, Exhs. 20-21. It is implausible the team would recover from having to adopt a new identity – a process that would take at least one year. Armstrong Dec., ¶¶ 58, 86, 93.

Against this specific evidence of harm, Defendant offers only three things. First is Olson's conclusory testimony about a parade of harms he fears his business will suffer absent a disfavored, mandatory preliminary injunction, with no mention of any actual losses sustained over the year plus in which Defendant failed to seek interim relief. Dkt. 30, ¶¶ 54-57. Such speculative statements, unsupported by anything other than Olson's say-so, are insufficient. *Altira*, 207 F. Supp. 2d at 1205; *Prime Media*, 33 F. Supp. 2d at 940-41; *Packerware*, 895 F. Supp. at 1453. Second is the naïve assertion that "Plaintiffs . . . will suffer no such harm, as they can simply resume using UTAH HOCKEY CLUB," Dkt. 29 at 25, as if Plaintiffs, their licensees, sponsors, and fans had mountains of old signs, inventory, team uniforms, and advertising material stockpiled and at the ready. Of course that's not the case. Armstrong Dec., ¶ 58. Third is blaming Plaintiffs for any harm they suffer, because they have supposedly built a business on infringement. Dkt. 29 at 25. That argument is only persuasive when the enjoined party intentionally engages in acts of copying, and a "strong showing of likelihood of success on the merits" is made. *Gen. Motors Corp.*, 500 F.3d at 1229. Neither is true here. Accordingly, this factor weighs heavily against Defendant's Motion.

### D. An Injunction Would Be Contrary to the Public Interest

The disfavored relief Defendant seeks would necessarily alter the status quo in a manner contrary to the interests of the public – most notably the team's licensees, sponsors, community

affiliates, media and fans.  Armstrong Dec., ¶¶ 26, 45-53, 55-92.  *See AG of Okla. v. Tyson Foods, Inc*., 565 F.3d 769, 776 (10th Cir. 2009) ("[we] caution courts against granting injunctions that alter the status quo or that require the nonmoving party to take affirmative action – a mandatory preliminary injunction – before a trial on the merits occurs.").  Despite Defendant's assertion that the public interest almost always favors a trademark owner, the compelling public interest in maintaining the status quo favors denying Defendant's Motion where its right to relief is far from "clear and unequivocal." *See, e.g.*, *Keybank Nat'l Ass'n v. Williams*, No. 20-1384, 2022 U.S. App. LEXIS 3701, at *8 (10th Cir. Feb. 10, 2022).

### E.     In the Unlikely Event a Disfavored, Mandatory Preliminary Injunction Issues, the Court Should Require a Substantial Bond

Though omitted from its Motion, Defendant must post a bond in the unlikely event it obtains relief.  *Equitable*, 434 F. Supp. 3d at 1255-56; Fed. R. Civ. P. 65(c).  Because substantial resources have been and continue to be expended on the UTAH MAMMOTH Marks, and because changing the team's name during the NHL season would cause massive disruption, the Court should require Defendant to post a bond of no less than $7 million.  In *UFirst*, the court held that a $10 million bond would be appropriate where defendant "presented evidence that it expended millions of dollars to develop and advertise its new trademark", "a rebrand so soon after [defendant] changed its name would likely erode some of [defendant's] good will" and "[defendant] will undoubtedly need to expend millions more to advertise a new name." *Id.*, 2023 U.S. Dist. LEXIS 173436, at *38.  Because all these *UFirst* considerations favor a substantial bond, in the unlikely event the Court grants Defendant's Motion, that bond should be set at no less than $7 million.

## V. CONCLUSION

For these reasons, the Court should deny Defendant's Motion.

Dated: October 30, 2025

*/s/ Michele Myer*

Michele M. Myer
myer.michele@dorsey.com
DORSEY & WHITNEY LLP
111 South Main Street, Suite 2100
Salt Lake City, UT 84111-2176
(801) 933-7360

Bruce R. Ewing
ewing.bruce@dorsey.com
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019
(212) 415-9200

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of October, 2025, a true and correct copy of the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION** was served electronically upon all counsel of record via the Court's CM/ECF filing system.

  */s/    Jacqueline Ervin*


## CERTIFICATE OF COMPLAINCE

I, Michele M. Myer, certify hereby certify that  **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION** contains 7,711 words and complies with DUCivR 7-1(a)(4).

  */s/    Michele M .Myer*