R. Jeremy Adamson (12818)
Catherine M. Maness (16885)
BUCHALTER
A Professional Corporation
60 E. South Temple, Suite 1200
Salt Lake City, UT  84111
(801) 401-8625
jadamson@buchalter.com
cmaness@buchalter.com

*Attorneys for Mammoth Hockey, LLC*

Gerald W. Griffin (*admitted pro hac vice*)
Leonardo Trivigno (*admitted pro hac vice*)
Meredith Spelman (*admitted pro hac vice*)
Jodutt Basrawi (*admitted pro hac vice*)
Janice J. Kwon (*admitted pro hac vice*)
CARTER LEDYARD & MILBURN LLP
28 Liberty Street
New York, New York 10005
212-238-8610
griffin@clm.com
trivigno@clm.com
spelman@clm.com
basrawi@clm.com
kwon@clm.com

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| UYTE, LLC and SEG HOCKEY, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>MAMMOTH HOCKEY, LLC<br><br>Defendant. | **DEFENDANT'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No.: 2:25-cv-00639-DB-CMR<br><br>Judge David Barlow<br>Magistrate Judge Cecilia M. Romero |

Defendant respectfully submits this Reply Memorandum of Law ("Reply")[1] in response to Plaintiffs' Opposition ("Opp.") and in further support of its Motion for a Preliminary Injunction.[2]

---

[1] The Reply Declaration of Gerald W. Griffin, dated November 13, 2025, is submitted in support of this Reply (the "Griffin Reply Decl.").

[2] Defendant adopts and cites herein to the defined terms in its Motion.

# TABLE OF CONTENTS

I. Plaintiffs Admit That Defendant Has Priority Rights in the Mark and Logo .............................. 1

II. Plaintiffs Admit They Took the Mark in Bad Faith .................................................................. 1

III. Plaintiffs Fail to Prove Acquiescence ..................................................................................... 3

IV. Plaintiffs Fail to Prove Laches ................................................................................................ 4

V. Plaintiffs Fail to Prove Any Harm Not Attributable to Their Own Conduct ............................. 6

VI. Plaintiffs Fail to Rebut Likelihood of Confusion .................................................................... 7

VII. A Mandatory Injunction Is Not Required .............................................................................. 9

VIII. The Court Has "Wide Discretion" to Set a Minimal, Or No Bond ..................................... 10

# **TABLE OF AUTHORITIES**

**Cases**                                                               **Page(s)**

*AAA Alarm & Sec. v. A3 Smart Home LP*,
   2021 U.S.Dist. LEXIS 163919,*21-22 (D. Ariz. Aug. 30, 2021) ........................................ 8, 10

*Big O Tires, Inc. v. Bigfoot 4x4, Inc.*,
   167 F. Supp. 2d 1216, 1229 (D.Colo. 2001) ......................................................................... 4, 5

*C.R. Bard, Inc. v. Med. Components, Inc.*,
   2019 U.S.Dist.LEXIS 67369,*17 (D.Utah 2019) ....................................................................... 4

*Creative Gifts, Inc. v. UFO*,
   235 F.3d 540, 547-548 (10th Cir. 2000) ..................................................................................... 3

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   269 F.3d 1149, 1155 (10th Cir. 2001) ........................................................................................ 9

*Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*,
   834 F. Supp. 1008, 1012 (N.D.Ill. 1993)……………………………………………………..3

*Fish v. Kobach*,
   840 F.3d 710, 753 (10th Cir. 2016) ............................................................................................ 4

*GTE Corp. v. Williams*,
   904 F.2d 536, 541 (10th Cir. 1990) ............................................................................................ 1

*Instructure, Inc. v. Canvas Tech., Inc.*,
   2022 U.S. Dist. LEXIS 2822, at *37 (D. Utah Jan. 5, 2022) .................................................. 7, 8

*J&J Snack Foods, Corp. v. Earthgrains Co.*,
   220 F. Supp. 2d 358 (D.N.J. 2002) ............................................................................................. 9

*King v. Innovation Books*,
   976 F.2d 824, 832-33 (2d Cir. 1992) .......................................................................................... 5

*Mr. Elec. Corp. v. Khalil*,
   2007 U.S. Dist. LEXIS 13633, at *6 (D. Kan. 2007) ............................................................... 10

*Overton v. Health Communs., Inc.*,
   2012 U.S. Dist. LEXIS 202192, *33,n.8 (W.D.Wisc. 2012) ...................................................... 4

*Packerware Corp. v. Corning Consumer Prods., Co.*,
   895 F. Supp. 1438, 1451 (D. Kan. 1995) ................................................................................... 7

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203, 1215 (10th Cir. 2009) .................................................................................. 5,10

*Sterling Drug, Inc. Bayer AG*,
   14 F.3d 733, 741 (2d Cir. 1994) ................................................................................................. 9

*Wreal, LLC v. Amazon.com, Inc.*,
   38 F.4th 114, 139 (11th Cir. 2022) ............................................................................................. 8

**Other Authorities**

5 McCarthy on Trademarks and Unfair Competition McCarthy's (5th ed. 2025) ...................... 3, 8

Restatement (Third) of Unfair Competition (1995) ...................................................................... 4, 6

Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement
   Implications, 13 J.Public Policy & Marketing 181, 182 (1994) ................................................. 8

**I. Plaintiffs Admit That Defendant Has Priority Rights in the Mark and Logo**

Plaintiffs concede they were aware Defendant had been using the Mark and Logo[3] to sell hockey bags and related goods on its website, Mammoth-hockey.com, before they began using the Accused Mark. Dkt. 36,¶10; Arm. Decl.,¶31. Plaintiffs do not contest – and thus concede – that Defendant has been doing so continuously since 2014 in forty-seven states. Olson Decl., ¶¶2,21-24,35-41. Plaintiffs also concede they are junior users who first began using the Accused Mark on May 7, 2025 (Dkt. 36,¶27) and thus have no registered or common law trademark rights of their own. *Id.*¶30. With these concessions, Plaintiffs' only possible defense to infringement is that they used the Accused Mark in good faith in a remote market.[4] *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir. 1990). Plaintiffs' submissions establish the exact opposite.

**II. Plaintiffs Admit They Took the Mark in Bad Faith**

<u>Plaintiffs Knew About Defendant's Mark in February 2025 *Before* They Decided to Use the Accused Mark in March, But Never Contacted Defendant.</u> Christopher Armstrong, Plaintiffs' President of Operations, confirms Plaintiffs contacted Defendant's former spokesman on February 13th, to get Defendant's contact information. Arm. Decl.,¶¶31,37, Olson Decl.,¶45. Plaintiffs purportedly "considered contacting Defendant directly," but never did. *Id.*,¶¶37-38; Dkt.36,¶24. Plaintiffs admit they "back[ed] away" from fan favorite "YETI" at the end of January (Arm. Decl.,¶17,Ex.5), and in February conducted rounds of fan voting on three names which yielded

---

[3] References to the Mark and to the Accused Mark include the Logo and Accused Logo, respectively.
[4] Plaintiffs admit they do not use the Accused Mark in markets remote from Defendant. Dkt. 36,¶28.

1

"Mammoth" as the new team name. In March, Plaintiffs spent "substantial time" "refining the branding," and "by April" they "had embraced the public's choice." *Id.*¶¶17-19.

<u>Plaintiffs Admit That They Made False Statements to Defendant About Their Intentions to Use the Accused Mark in April.</u> Sixty-one days after Plaintiffs obtained Defendant's contact information, Defendant's co-founder contacted Plaintiffs and inquired whether they intended to use the "Mammoth" name. *Id.*,¶38. Although Plaintiffs had decided in March to use the name, Mr. Armstrong directed his assistant to falsely respond that Plaintiffs had "not reached any determinations yet but will definitely keep [a] partnership in mind." *Id.*,¶40.

While communicating with Defendant, Plaintiffs failed to mention Defendant's Facebook post in June 2024, stating it was partial to "Mammoth". While it was purportedly the entire basis for Plaintiffs' belief that they already had Defendant's consent to use the Accused Mark, instead of confirming with Defendant that was their understanding, Plaintiffs never mentioned it in their communications. *Id.*,¶¶40-41. Instead, Plaintiffs flooded the market with the Accused Mark on May 7, 2025, less than two weeks after Defendant's inquiry. *Id.*,¶¶23-27.

<u>Plaintiffs' Prior Conduct Belies Their Purported Reason for Making False Statements.</u> Mr. Armstrong claims Plaintiffs misrepresented their intention to use the Accused Mark to Defendant because the team wanted "to avoid announcing [publicly] that a decision had been made." *Id.*,¶40. But Plaintiffs had earlier engaged with Yeti to determine if they could resolve Yeti's concerns (*Id.*,¶28), and also apparently engaged with a number of other parties about the names being considered. *Id.*,¶29. The notion that Plaintiffs could not discuss their potential use of Defendant's Mark like they had with others is simply not credible.

<u>Plaintiffs Admit They Did Not Conduct A Reasonable Investigation Of Defendant's Mark Before Taking It.</u> Plaintiffs decided to use the Accused Mark in March 2025, but their alleged investigation into the likelihood of confusion with Defendant's Mark was conducted in September and October 2025, 4½-5 months after they flooded the market in May, and 1½-2 months after they commenced this litigation. *See* Dkt. 41,¶¶9-21; Dkt. 42,¶¶9-10; Dkt. 40,Ex.1,¶31.

<u>Plaintiffs Proffer No Opinion Letter from Counsel.</u> Plaintiffs claim they adopted the Accused Mark after a "painstaking process with counsel" (Opp. at 8), but conspicuously absent is any opinion letter from the attorneys who helped Plaintiffs "navigate every step" of "the legal and brand challenges." Griffin Reply Decl.,Ex.D. p. 2. Opinion letters are routinely used as proof of good faith, but Plaintiffs' failure to disclose the advice of counsel they received precludes them from raising the fact of legal consultation as part of their good faith argument. 5 McCarthy on Trademarks and Unfair Competition McCarthy's §23:117 (5th ed. 2025) ("McCarthy"); *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1012 (N.D.Ill. 1993).

Having taken Defendant's Mark in bad faith, Plaintiffs have no defense to infringement. Nonetheless, Plaintiffs try to avoid an injunction by arguing Defendant acquiesced in, or delayed objecting to their infringement. This is absurd.

**III. Plaintiffs Fail to Prove Acquiescence**

To establish acquiescence, Plaintiffs must prove conduct by Defendant that amounted to an assurance, express or implied, that it would not assert its trademark rights against them. *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 547-548 (10th Cir. 2000). But when Plaintiffs decided to go all in on the Accused Mark in March 2025, they had *no* communications with Defendant whatsoever. Thus, the only conduct Plaintiffs can point to was Defendant's Facebook post in June 2024. But

3

nothing in that post contains any assurances to Plaintiffs that Defendant would not assert its rights. Arm. Decl.,¶36. The notion that Plaintiffs decided to invest $millions in developing the Accused Mark because they believed this Facebook post manifested Defendant's consent—and then inexplicably failed to raise that point with Defendant when Defendant contacted them in April— defies reason. *See* Restatement (Third) of Unfair Competition § 29 (1995) (the "Restatement").

**IV. Plaintiffs Fail to Prove Laches**

To establish laches, Plaintiffs must prove (1) Defendant's delay in filing a suit was "unreasonable and inexcusable," and (2) Plaintiffs suffered "material prejudice attributable to the delay." *C.R. Bard, Inc. v. Med. Components, Inc.*, 2019 U.S.Dist.LEXIS 67369,*17 (D.Utah 2019). Any delay attributable to a party must be measured from the time the party "knew or should have known that infringement had ripened into a provable claim." *Big O Tires, Inc. v. Bigfoot 4x4, Inc.*, 167 F. Supp. 2d 1216, 1229 (D.Colo. 2001). Delay is only one factor to be considered: "[t]he question ... is whether the delay was reasonable, was not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party." *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016). A party's "unclean hands," such as concealing a cause of action, precludes it from asserting laches. *Overton v. Health Communs., Inc.*, 2012 U.S. Dist. LEXIS 202192, *33,n.8 (W.D.Wisc. 2012).

<u>Plaintiffs Are Guilty of Unclean Hands by Concealing Their Intent to Infringe</u>. Right up until May 7th, Plaintiffs had never used the Accused Mark and had informed Defendant on April 24 that they had not yet decided which name they would choose, and if they ended up choosing "Mammoth," Plaintiffs would consider a partnership. Arm.Decl¶40. Less than two weeks later, Plaintiffs flooded the market with the Accused Mark. Mr. Armstrong admits Plaintiffs concealed their intention to use the Accused Mark before the public announcement. Arm. Decl.,¶¶40-41. Such

4

actions constitute unclean hands which bars Plaintiffs from asserting laches. *See King v. Innovation Books*, 976 F.2d 824, 832-33 (2d Cir. 1992).

<u>Any "Delay" by Defendant in Bringing the Motion Was Reasonable.</u> A laches analysis "'assumes the existence of an infringement for an extended period prior to the commencement of litigation.'" *Big O Tires*, 167 F. Supp. 2d at 1228-1229. But here, up until May 7th, Plaintiffs were still using the name UTAH HOCKEY CLUB and had assured Defendant they had not decided which name they were going to choose. Defendant had no reason to suspect otherwise. Only when they flooded the market on May 7 did they first infringe, which then "ripened into a provable claim." *Id.* at 1228.

Indeed, Defendant found itself on May 7 suddenly having to locate trademark attorneys who could take the matter on reasonable terms and initially encountered counsel who were conflicted. Olson Decl.,¶49. As soon as Defendant engaged counsel, they promptly served a cease-and-desist letter on June 10, which noted that Defendant still "hope[d] that this issue may be amicably resolved." Dkt 31, Ex.23. Plaintiffs did not respond until two weeks later, making clear they had no interest in a resolution. Dkt. 2,Ex.2. Any delay resulting from Defendants' good faith attempts to seek a potential resolution before litigation does not support laches. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211-12 (10th Cir. 2009).

Defendant's counsel received Plaintiffs' letter while in final preparations for a patent trial in Washington D.C. which ended July 25th. Days later, Defendant's counsel responded. Plaintiffs then filed their Complaint on August 1st. From that point, Defendant's counsel, entirely new to the dispute, took a little less than eight weeks to investigate the underlying facts, prepare Counterclaims, and draft the Motion. Plaintiffs' counsel – already familiar with the facts –

requested and received an extension of time for a total of five weeks to respond to the Motion, on the grounds that it involves "complex legal and factual issues." Dkt. 32, p.2. Compared to five weeks, the less than eight weeks Defendant took to investigate and respond to Plaintiffs' Complaint and then prepare the Motion, does not support laches. Restatement §31, Comment C; *King*, 976 F.2d at 831.

**V. Plaintiffs Fail to Prove Any Harm Not Attributable to Their Own Conduct**

Harm that is attributable to Plaintiffs' conduct, rather than Defendant's delay, will not support laches. Restatement §31, Comment B. Here, Plaintiffs decided in March to go all in on the Accused Mark and spent substantial time and money on refining the brand. Arm. Decl.,¶19. Before making that decision, Plaintiffs spent sixty-one days "considering" whether to contact Defendant, but then chose not to. *Id.*,¶38. When Defendant contacted them in April, Plaintiffs could have negotiated with Defendant or at least confirmed their purported understanding that Defendant "acquiesced" to their use via its Facebook post, but Plaintiffs never mentioned it. Instead, they misdirected Defendant and then rushed the Accused Mark to the market. Thus, all of Plaintiffs' investments in the Accused Mark are directly attributable to their own unilateral choices, made while keeping Defendant in the dark until they began infringing on May 7th. [5] They elected "to place [their] bet" "before the contested legal issue was presented or decided," and "chose to expend significant time and resources on the name change anyway," and those costs which Plaintiffs could

---

[5] The facts here are distinguishable from Plaintiffs' cases cited for the proposition that even short delays rebut irreparable harm where opposing parties changed position over time while infringing. *See cases* cited in Opp., pp.11,16. Here, unbeknownst to Defendant, Plaintiffs had committed to their investments in the Accused Mark months before they commenced infringing.

6

have avoided do not factor into a laches analysis. *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1254-55 (D.Utah 2020).

### VI. Plaintiffs Fail to Rebut Likelihood of Confusion[6]

While evidence of actual confusion is not required, it is often considered the best evidence of likelihood of confusion. *Instructure, Inc. v. Canvas Tech., Inc.*, 2022 U.S. Dist. LEXIS 2822, at *37 (D. Utah 2022). "But, because evidence of actual confusion can be difficult to obtain, its absence is generally unnoteworthy and is given little probative weight." *Id.* Particularly because the Accused Mark has been in commerce "for a short time, evidence of actual confusion is particularly apt to be unavailable and its absence...is understandable." *Packerware Corp. v. Corning Consumer Prods., Co.*, 895 F. Supp. 1438, 1451 (D. Kan. 1995). At this stage of the proceedings, Defendant has proffered more than sufficient evidence of likelihood of confusion, including direct evidence of actual confusion.

For example, customers of both Plaintiffs' and Defendant's goods have experienced confusion. On October 6, Defendant received an email request through its website from an obvious customer of Plaintiffs, seeking Defendant's assistance in purchasing eleven tickets to a Utah Mammoth hockey game. Griffin Reply Decl.,¶36(a), Ex.E. On November 3, a potential customer of Defendant's wrote on twitter, "was searching for mammoth hockey bags but ended up directed to Utah mammoth what is this?" *Id.*,¶36(b),Ex.F. Several consumers have also publicly confirmed confusion between the two parties' marks (*id.* Exs.G,H), while others confirmed that post-

---

[6] For the reasons set forth in the Motion, Defendant has established that all of the factors of likelihood of confusion tip in its favor. Motion,pp.14-21.

litigation, their own internet searches for "mammoth hockey bags" yields "UTAH MAMMOTH" hockey bags and displaces Defendant's website. *Id.*, ¶36(e-i),Exs.I, J.

Several other consumers have also publicly expressed their views that Plaintiffs' use of the Accused Mark is likely to cause confusion with Defendant's Mark, harm Defendant, or that Plaintiffs did not do their due diligence before using the Accused Mark. *Id.*, ¶36(j-p), Exs. I-K. Finally, several consumers have opined that Defendant will only benefit from being affiliated with Plaintiffs. *Id.*, ¶36(q-t). Defendant's evidence of likelihood of confusion is more than sufficient. *See Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 139 (11th Cir. 2022); *Instructure*, 2022 U.S. Dist. LEXIS 2822 at *37-38; *AAA Alarm & Sec. v. A3 Smart Home LP*, 2021 U.S.Dist. LEXIS 163919,*16-21 (D. Ariz. 2021).

In contrast, Plaintiffs' survey was performed too soon to yield reliable evidence to rebut Defendant's compelling evidence of confusion. In reverse confusion cases, Eveready surveys do not yield useful results until the Accused Mark has fully saturated the market. McCarthy §23:10,n.32. That is because an Eveready survey does not show respondents the newer junior mark and instead simply assumes awareness. McCarthy §32:174; Dkt.40,Ex.F. Because Plaintiffs' Accused Mark launched only a few months ago and is not yet well known, an Eveready survey will underreport confusion. *See* Dr. Itamar Simonson, Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications, 13 J.Public Policy & Marketing 181, 182 (1994).

Plaintiffs' survey is also flawed because it surveyed the wrong customer base. "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." McCarthy §32.162.

In reverse confusion cases, the relevant issue is whether the senior user's consumers – Defendant's customers – mistakenly believe that the senior user's products actually originate with the junior user. *Sterling Drug, Inc. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994). Thus, "the proper survey universe consists of prospective purchasers of Mammoth Hockey bags" (Dkt. 40,Ex.1,¶18-19; Dkt. 37,p.23), that Plaintiffs recognize are a "specialized audience" (Dkt. 37,31) willing to spend between $189 to $275 on a premium hockey bag (D.I. 42,¶8 and Ex.5), bags which Plaintiffs state are "so pricey, that they sit at the top of the market ... *unlike Plaintiffs' bags, which are less expensive and aimed at a different market segment*." Dkt. 37,26 (emphasis added). But Dr. Simonson surveyed individuals "considering" purchasing a hockey bag for as little as $100 (Dkt.40,Ex.1,¶24,Ques.65; Dkt.37,23), but that is actually the price of *Plaintiffs'* hockey bags.[7] Dkt. 42,Ex.5; Dkt. 31,Ex.20. It is clear then that the Simonson Survey surveyed Plaintiffs' customer base, and not Defendant's, which was the wrong universe, and therefore the results are irrelevant. *J&J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358 (D.N.J. 2002).

**VII. A Mandatory Injunction Is Not Required**

Plaintiffs argue that the relief sought by Defendant should be assessed under the heightened burden for mandatory injunctions because it would alter the status quo by requiring them to take affirmative steps to unwind their use of the Accused Mark. Opp., pp.1,10,34-36. But the status quo to be considered is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing" (*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001)), and the Tenth Circuit has rejected similar arguments made

---

[7] As of the date of filing, google searches reveal a price range for Plaintiffs' hockey bags of between $83.99 and $119. Griffin Reply Decl.,¶37;Griffin Decl.Ex.20.

by parties who – like Plaintiffs – through their own conduct upended the status quo immediately preceding the litigation. *Id.* Here, a preliminary injunction requiring Plaintiffs to revert back to using "Utah Hockey Club" – the last uncontested status quo between the parties – will not require them "to do something it was not already doing during the last uncontested period." *Id*. Moreover, a "preliminary injunction is prohibitory, not mandatory" where "it prohibits defendants from violating trademark and unfair competition law." *Mr. Elec. Corp. v. Khalil*, 2007 U.S. Dist. LEXIS 13633, *6 (D. Kan. 2007). Regardless, Defendant is entitled to injunctive relief under either standard.

### VIII. The Court Has "Wide Discretion" to Set a Minimal, Or No Bond

Plaintiffs seek a $7 million bond (Opp.36), but this Court has "wide discretion" in setting the amount of a preliminary injunction bond and may even determine to refuse to set any bond. *RoDa Drilling Co.*, 552 F.3d at 1215. In this reverse confusion case, where Plaintiffs "entered a market with an existing smaller business using their desired mark, and either declined to investigate or chose to ignore [Defendant's] presence," granting Plaintiffs' requested bond "would completely prevent [Defendant] from seeking appropriate injunctive relief." *AAA Alarm & Sec.*, 2021 U.S. Dist. LEXIS 163919 at *23-24. Defendant respectfully submits that under all of the circumstances, no bond, or a nominal one is appropriate.

### IX. CONCLUSION

For the foregoing reasons, Mammoth Hockey respectfully requests that the Court grant its motion for a preliminary injunction and issue an Order enjoining Plaintiffs from any and all use of the Accused Mark and Logo.

| | |
|---|---|
| Date: November 13, 2025 | */s/* Gerald W. Griffin |
| | Gerald W. Griffin (*admitted pro hac vice*) |
| | Leonardo Trivigno (*admitted pro hac vice*) |
| | Meredith Spelman (*admitted pro hac vice*) |
| | Jodutt Basrawi (*admitted pro hac vice*) |
| | Janice J. Kwon (*admitted pro hac vice*) |
| | CARTER LEDYARD & MILBURN LLP |
| | 28 Liberty Street, 41st Floor |
| | New York, New York 10005 |
| | 212-238-8610 |
| | griffin@clm.com |
| | trivigno@clm.com |
| | spelman@clm.com |
| | basrawi@clm.com |
| | kwon@clm.com |
| | |
| | R. Jeremy Adamson (12818) |
| | Catherine M. Maness (16885) |
| | BUCHALTER |
| | A Professional Corporation |
| | 60 E. South Temple, Suite 1200 |
| | Salt Lake City, Utah 84111 |
| | (801) 401-8625 |
| | jadamson@buchalter.com |
| | cmaness@buchalter.com |
| | |
| | *Attorneys for Mammoth Hockey, LLC* |

11

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of November, 2025, a true and correct copy of the foregoing DEFENDANT'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION was served upon all counsel of record electronically, through the Court's CM/ECF filing system.

/s/ Gerald W. Griffin
Gerald W. Griffin

**CERTIFICATE OF COMPLIANCE**

I Gerald W. Griffin, hereby certify that DEFENDANT'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION contains 3,040 words and complies with DUCivR 7-1(a)(4).

/s/ Gerald W. Griffin
Gerald W. Griffin