UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UYTE, LLC and SEG HOCKEY, LLC,<br><br>     Plaintiffs,<br><br>v.<br><br>MAMMOTH HOCKEY, LLC,<br><br>     Defendant. | **ORDER DENYING [29] MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:25-cv-00639-DBB-CMR<br><br>Judge David Barlow<br><br>Magistrate Judge Cecilia M. Romero |

Defendant Mammoth Hockey, LLC ("Mammoth Hockey") seeks an injunction preventing Plaintiffs SEG Hockey, LLC and Uyte, LLC (collectively "Plaintiffs") from any and all use of the UTAH MAMMOTH mark ("Accused Mark") and logo of a mammoth's head ("Accused Logo") (collectively "Accused Marks"), including marketing and selling hockey-related goods, apparel and accessories, including hockey bags, bearing the Accused Marks.[1] For the reasons stated below, the motion is denied.

## BACKGROUND

Mammoth Hockey is a small business in Portland, Oregon that designs and sells hockey-related goods, including "highly durable hockey bags."[2] Since 2014, Mammoth Hockey has manufactured, marketed, and sold its products bearing the MAMMOTH HOCKEY mark ("Mark") and an accompanying logo of a mammoth's head ("Logo") (collectively "Marks") through its website in forty-seven states and Canada.[3] In addition to its website, Mammoth

---

[1] Def. Mammoth Hockey, LLC's Mot. for Prelim. Inj. ("Mot."), ECF No. 29, filed Sept. 25, 2025.
[2] *Id.* 5.
[3] *Id.* Mammoth Hockey has sold its products in all U.S. states except Hawaii, Mississippi, and North Dakota.

Hockey maintains social accounts on Instagram, Facebook, and YouTube to promote its products and provide demonstration videos.[4] Mammoth Hockey also promotes its business at tournaments in the United States and Canada where it distributes stickers, hats, coupons, and postcards bearing its Marks.[5] Designed for durability, their hockey bags sell for around $189 to $275.[6]

Plaintiffs are the owners of Utah's National Hockey League ("NHL") team.[7] In 2024, Plaintiffs purchased the team formerly known as the Arizona Coyotes and relocated the team to Utah, where it played its first season under the temporary name UTAH HOCKEY CLUB.[8]

Plaintiffs invited fans to vote on the team's permanent name in a highly publicized selection process.[9] UTAH MAMMOTH was one of the initial options.[10] Plaintiffs subsequently learned of trademark issues with some of the names through their rejected trademark applications and third-party objections.[11] Mammoth Hockey did not object to the possibility of UTAH MAMMOTH, and when it became a finalist in June 2024, Mammoth Hockey remarked on Facebook that it was "pretty partial" to that name.[12]

In April 2025, Mammoth Hockey reached out to Plaintiffs about the possibility of a partnership when it learned that they had contacted a professional hockey player who had sponsored Mammoth Hockey about how to get in touch with it.[13] Co-owner Erik Olson reached out to Plaintiffs' representative to inquire about their intentions to use the Marks, remarking that

---

[4] *Id.* 6.
[5] *Id.* 6.
[6] Def.'s Reply in Further Support of Mot. for Prelim. Inj. ("Reply") 9, ECF No. 49, filed Nov. 13, 2025.
[7] Mot. 7.
[8] *Id.* 7.
[9] Pls.' Opp'n to Def.'s Mot. for Prelim. Inj. ("Opp'n") 2, ECF No. 37, filed Oct. 30, 2025.
[10] Mot. 1–2; Opp'n 2.
[11] Mot. 2; Opp'n 2 (detailing YETI's objection to the possibility of UTAH YETIS as a team name).
[12] Opp'n 2, 12.
[13] Mot. 8–9.

"If the Utah Hockey Club ends up being the Mammoth next season (I know you can't divulge) then it would be cool to talk about a possible collaboration."[14] Mr. Olson heard back from Plaintiffs' representative who stated that "they have not reached any determinations yet but will definitely keep this partnership in mind should things end up moving in that direction."[15]

On May 7, 2025, Plaintiffs officially unveiled "UTAH MAMMOTH" as the team name and a mammoth head as the new logo.[16] The announcement received considerable media coverage.[17] That day, Plaintiffs also began selling merchandise with the Accused Marks at a store in its home arena, the Delta Center, and learned that the United States Patent and Trademark Office ("USPTO") rejected its application for the Accused Mark.[18] As part of its merchandise, Plaintiffs sell hockey bags in the $83.99 to $119 price range.[19]

On June 10, 2025, Mammoth Hockey sent Plaintiffs a cease-and-desist letter, objecting to their use of the Accused Marks.[20] Plaintiffs responded that they were aware of Mammoth Hockey's Marks but confident they were not infringing on its trademark rights.[21] At the end of July, Mammoth Hockey asked Plaintiffs' counsel if they would accept service of a complaint for infringement.[22] The following day, Plaintiffs filed the complaint in this action.[23]

---

[14] *Id.* 9.
[15] *Id.* 9.
[16] *Id.* 9.
[17] Decl. of Christopher B. Armstrong in Support of Pls.' Opp'n to Def.'s Mot. for Prelim. Inj. ("Armstrong Decl.") ¶ 23, ECF No. 38, filed Oct. 30, 2025.
[18] Mot. 9–10; Decl. of Gerald W. Griffin in Support of Def.'s Mot. for Prelim. Inj. ("Griffin Decl.") ¶ 23, ECF No. 31, filed Sept. 25, 2025. In its decision, the USPTO required Plaintiffs to disclaim "UTAH" because it is geographically descriptive. Plaintiffs have challenged the decision and, as of this day, the application is still pending. *See* Mot. 10.
[19] Griffin Decl., Ex. 20; Reply 9.
[20] Mot. 11; Griffin Decl., Ex. 23.
[21] Mot. 11.
[22] *Id.* 11.
[23] *Id.* 11.

## STANDARD

"Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: '(1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.'"[24] "The likelihood-of-success and irreparable harm factors are 'the most critical' in the analysis."[25]

"'A preliminary injunction is an extraordinary remedy, the exception rather than the rule.'"[26] "A preliminary injunction has the 'limited purpose' of 'preserv[ing] the relative positions of the parties until a trial on the merits can be held.'"[27] "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal."[28]

In the Tenth Circuit, "[c]ertain types of preliminary injunctions are disfavored and require a movant to satisfy a heightened standard."[29] For example, "[a]n injunction is disfavored if '(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win.'"[30] If "any of these three characteristics are present, the moving party faces a heavier burden on the likelihood-of-success-

---

[24] *First W. Cap. Mgmt. Co.*, 874 F.3d 1136, 1141 (quoting *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016)).

[25] *Szymakowski v. Utah High School Activities Ass'n, Inc.*, 756 F. Supp. 3d 1238, 1246–47 (D. Utah 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

[26] *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quoting *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, 916 F.3d 792, 797 (10th Cir. 2019)).

[27] *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018) (quoting *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005)).

[28] *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

[29] *State v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 883–84 (10th Cir. 2021).

[30] *Szymakowski*, 756 F. Supp. 3d at 1247 (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 797).

on-the-merits and balance-of-harms factors."[31] "The movant must make a strong showing that these factors tilt in its favor."[32] "The Tenth Circuit defines the 'status quo' as 'the last peaceable uncontested status existing between the parties before the dispute developed.'"[33] An injunction "falls into the all-the-relief category only if its effect, once complied with, cannot be undone."[34] "If the court probably can put the toothpaste back in the tube, then the heightened standard does not apply."[35]

Here, the court need not decide whether the injunction is mandatory or prohibitory because it fails under the lower, prohibitory, standard.[36] Therefore, the court applies the less demanding standard in its analysis.

## DISCUSSION

### I.    Likelihood of Success

In the Tenth Circuit, typically "the irreparable harm requirement must be satisfied before the other factors may be considered."[37] Yet the Lanham Act modified that order of operations when it was recently amended by Congress "to expressly allow a presumption of irreparable

---

[31] *Id.* (cleaned up).

[32] *Security USA Servs., LLC v. Invariant Corp.*, No. 1:20-cv-01100, 2021 WL 2936612, at *2 (D.N.M. July 13, 2021).

[33] *Szymakowski*, 756 F. Supp. 3d at 1247 (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3 (citing 11A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 2948 (3d ed & Nov. 2018 update); *see also Dominion Video Satellite, Inc.*, 269 F.3d at 1155 (defining the status quo as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing" (citation omitted)).

[34] *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3 (citations and quotations omitted).

[35] *Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239 (D. Utah 2020) (citation and quotation marks omitted).

[36] *Universal Servs. of Am., LP v. Miner*, 2:25-cv-00795, 2025 WL 3022644, at *3 n.6 (D. Utah Oct. 29, 2025) ("Because the court finds that Plaintiffs are not entitled to preliminary relief even under the less demanding standard, it need not decide whether the heightened standard applies.").

[37] 11A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 2948 (3d ed & Sept. 2025 update) (citing *State v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021)).

injury when the owner of a trademark proves likelihood of success on the merits."[38] Therefore, the court first addresses likelihood of success before turning to irreparable harm.[39]

To prevail on a claim for trademark infringement under the Lanham Act, Mammoth Hockey must prove that it has a protectable mark,[40] that Plaintiffs are using a similar or identical mark "in connection with any goods or services," and that Plaintiffs' use "creates a likelihood of confusion."[41] "Of these factors, 'the central inquiry' is the likelihood of consumer confusion."[42]

Mammoth Hockey argues that it is likely to succeed on its claim for trademark infringement because all three elements are met.[43] Plaintiffs respond that the Accused Marks are dissimilar and there is no strong showing of reverse confusion.[44]

## A.    Protectability

Neither party disputes the protectability of Mammoth Hockey's Marks. Mammoth Hockey acknowledges the Marks are not registered with the USPTO but contends that its "first and continued commercial use" of them establishes its common law trademark rights.[45] In the Tenth Circuit, a party "acquires a protectable interest by 'using a distinct mark in commerce.'"[46] So long as a party makes "bona fide use of a mark in the ordinary course of trade" and "is the

---

[38] *Trial Lawyers Coll. v. Gerry Spence Trial Lawyers Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1270 (10th Cir. 2022) (citing Trademark Modernization Act of 2020, Pub. L. 116-260, § 226(a), 134 Stat. 2200, 2208 (codified at 15 U.S.C. § 1116(a) (2020)).
[39] *See Szymakowski*, 756 F. Supp. 3d at 1246–47 ("The likelihood-of-success and irreparable harm factors are 'the most critical' in the analysis.") (quoting *Nken*, 556 U.S. at 434).
[40] Plaintiffs do not challenge Mammoth Hockey's ownership of a protectable mark, so this element is satisfied.
[41] *Equitable Nat'l Life Ins. Co., Inc.*, 434 F. Supp. 3d at 1239.
[42] *Id.* at 1239–40 (quoting *Beltronics USA, Inc. v. Midwest Inventory Dist., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009)).
[43] Mot. 12–24.
[44] Opp'n 17–20.
[45] Mot. 1.
[46] *Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1053 (10th Cir. 2021) (quoting *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015)).

first to use a particular mark, that person will prevail against subsequent users of the mark."[47] Here, it is undisputed that Mammoth Hockey has been continuously using the Marks since 2014 to sell hockey-related goods in most of the United States and Canada.[48] Therefore, the court concludes Mammoth Hockey is likely to succeed in proving it possesses a protectable trademark.

### B.      Commercial Use

Mammoth Hockey contends this element was met on May 7, 2025, when Plaintiffs began selling merchandise, including hockey bags, with the Accused Marks.[49] As Plaintiffs do not contest this point, Mammoth Hockey is also likely to succeed on this element.

### C.      Likelihood of Confusion

As mentioned above, "actions for trademark infringement under the Lanham Act turn in significant part on whether the allegedly infringing mark will cause a likelihood of confusion."[50] The Tenth Circuit evaluates likelihood of confusion under the following six factors:

> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks.[51]

"These factors are interrelated and no one factor is dispositive."[52]

---

[47] *Underwood*, 996 F.3d at 1053 (internal citations and quotation marks omitted).
[48] Mot. 1; Opp'n 25–26.
[49] Mot. 14.
[50] *Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1245.
[51] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002).
[52] *Id.*

### 1.    Degree of Similarity Between the Marks

Of the six factors, "the degree of similarity is the most important factor."[53] Courts measure similarity by "sight, sound, and meaning."[54] In analyzing these elements, courts "must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark."[55] Although "the dominant portion is given greater weight, each mark still must be considered as a whole."[56]








---

[53] *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019).
[54] *Sally Beauty*, 304 F.3d at 972.
[55] *Id.*
[56] *First Sav. Bank, FSB v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir. 1996); *see also Sara Lee Corp. v. Sycamore Family Bakery Inc.*, No. 2:09-cv-523, 2009 WL 3617564, at *3 (D. Utah Oct. 27, 2009) ("Although the similarity of the marks is measured by the marks in their entireties, it is proper to give greater force and effect to the dominant portions of the parties' marks.").

Visually, the dominant portions of the competing trademarks share some similarities.[57] Both display "MAMMOTH" in all capital letters and use a similar, blocky font. Both also use a logo of a mammoth's head either above or to the left of the wording. Further, both trademarks are horizontally oriented.

However, as a whole, the Marks reveal significant differences. For example, "MAMMOTH" precedes "HOCKEY" in Mammoth Hockey's Mark and follows "UTAH" in Plaintiffs' Mark. The font is black, or brown, for both words in Mammoth Hockey's Mark while the font is bi-colored: blue (for "UTAH") and white (for "MAMMOTH") in Plaintiffs' Mark. The two "M"s in "Mammoth Hockey lean together and the remainder of the lettering appears purely vertically oriented, while the "Utah Mammoth" lettering all tilts toward the right off the vertical axis. The logo in Mammoth Hockey is a red, or brown, mammoth head that faces forward, while the logo in Plaintiffs' is a profile view of a mammoth head with "rock black, salt white, and mountain blue" colors.[58] And although both logos are mammoth heads, they are very stylistically distinct. Mammoth Hockey's mammoth head is smooth, streamlined, and minimalist, while Plaintiffs' mammoth head has jagged lines intended to represent the Wasatch Mountains; it also includes an outline of the state of Utah and a letter "M."[59] Both on initial and repeat consideration, these logos simply do not look similar. In sum, the court concludes that visually, the differences outweigh the similarities in the Marks enough that consumers are not likely be confused, even when the Marks are singly presented.

---

[57] The first set of images come from Mammoth Hockey's Motion and the second set comes from Plaintiffs' Opposition. *See* Mot. 16; Opp'n 18.
[58] Armstrong Decl. ¶ 15.
[59] *Id.* ¶ 24.

As to sound, which refers to pronunciation, the dominant portion—"MAMMOTH"—is identically pronounced. Taken as a whole, however, "MAMMOTH HOCKEY" does not sound similar to "UTAH MAMMOTH" both because "HOCKEY" does not sound like "UTAH" and because one precedes, rather than follows, "MAMMOTH." Thus, sound weighs against the similarity of the Marks.

As to meaning, Mammoth Hockey contends the Marks "create the same overall impression" of "strength, endurance and resiliency of a mammoth to the sport of hockey and hockey-related goods, including hockey bags."[60] Given that Plaintiffs do not dispute this point and consumers are likely to find this meaning since both trademarks use the same dominant word, meaning weighs in favor of similarity.

Mammoth Hockey relies on the dominant portion of the Marks to argue they are extremely similar.[61] For support, Mammoth Hockey offers the USPTO's rejection of "UTAH YETIS" and "UTAH VENOM," which were the other trademarks Plaintiffs considered. Mammoth Hockey argues that USPTO refused those marks, which included no logos or graphic elements, because "UTAH" is merely a geographic description.[62] Mammoth Hockey also argues that "HOCKEY" is merely descriptive of the type of goods sold, just as the district court in *Sara Lee Corp. v. Sycamore Family Bakery Inc.*, held that the word "Bakery" had "nominal commercial significance."[63] Because the dominant "MAMMOTH" is nearly identical in both parties' marks, then, Mammoth Hockey argues that this element is met.

---

[60] Mot. 16.
[61] *Id.* 15.
[62] Mot. 2, 7–8; Griffin Decl. ¶¶ 11–13, Exs. 9, 10, 11, 12; Opp'n 20 n.4.
[63] *Sara Lee Corp.*, 2009 WL 3617564, at *3.

In response, Plaintiffs argue that "UTAH" acquired trademark significance when the USPTO granted its "UTAH HOCKEY CLUB" mark without requiring a disclaimer of "UTAH."[64] Further, they argue that even if "UTAH" and "HOCKEY" lacked trademark significance, they cannot be entirely excluded when comparing the Marks.[65]

"While it is true that the dominant portion of each mark is entitled to greater weight in evaluating likelihood of confusion, each mark is to be considered as a whole."[66] For instance, in *Universal Money Centers, Inc. v. AT&T*, the Tenth Circuit held that terms which the USPTO have deemed merely descriptive of services, or otherwise "disclaimed" for trademark purposes, "cannot be ignored" when analyzing the similarity of marks because "disclaimed material still forms a part of the mark."[67] Therefore, the court may give more weight to "MAMMOTH" but it does not entirely ignore "UTAH" or "HOCKEY" in evaluating the degree of similarity.

In sum, the paramount similarity factor weighs against Mammoth Hockey.[68] The dominant portions of the marks are somewhat visually similar and share the same meaning, but taken as a whole, the marks' differences in pronunciation, color scheme, lettering orientation, and logo design outweigh the similarities.

---

[64] Opp'n 19; Decl. of Jessica Groen in Support of Plaintiffs' Opp'n to Def.'s Mot. for Prelim. Inj. ("Groen Decl."), Ex. 4, ECF No. 42, filed Oct. 30, 2025.
[65] Opp'n 19.
[66] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994).
[67] *Id.*
[68] *See Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019) (holding that "the degree of similarity is the most important factor").

## 2.    Intent of the Alleged Infringer in Adopting Its Mark

Under the next factor, the court must consider whether Plaintiffs "had the intent to derive benefit from the reputation or goodwill" of Mammoth Hockey.[69] "When a defendant intentionally uses the trademark of another it is presumed he did so in order to cause confusion between his products and those of the one holding the trademark."[70]

Mammoth Hockey contends this is a "reverse confusion" case, which it argues warrants a different intent inquiry of whether the alleged infringer "acted carelessly or otherwise culpably in selecting the allegedly infringing name."[71] Reverse confusion "occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user."[72] In such cases, the intent inquiry changes because "the junior user does not seek to profit from the good will associated with the senior user's mark."[73]

Here, Mammoth Hockey argues that Plaintiffs acted in bad faith when they saturated the market with the Accused Marks despite knowing that Defendant had used the Marks since 2014.[74] In response, Plaintiffs point out that the last time the Tenth Circuit addressed reverse confusion, in 1994, it did not apply this standard and held, instead, that the "proper focus remains whether defendant had intent to derive benefit from the reputation or goodwill of plaintiff."[75]

Following the Tenth Circuit, the court applies the traditional standard to this factor and concludes that it weighs in favor of Plaintiffs. Although Plaintiffs admit they were aware of

---

[69] *Delta Western Grp., LLC v. Ruth U. Fertel, Inc.*, No. 2:00-cv-0045C, 2000 WL 33710852, at *6 (D. Utah Sept. 28, 2000) (quoting *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987)).
[70] *Marker Int'l v. deBruler*, 635 F. Supp. 986, 999 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir. 1988).
[71] *Altira Grp. LLC v. Philip Morris Cos., Inc.*, 207 F. Supp. 2d 1193, 1200 (D. Colo. 2002).
[72] *Id.* at 1197 (citation omitted).
[73] *Id.* (citation omitted).
[74] Mot. 18.
[75] *See* Opp'n 20; *Universal Money Ctrs.*, 22 F.3d at 1532 (quotations marks and citation omitted).

Mammoth Hockey through their searches of the use of "Mammoth," it is unlikely they had the intent to benefit from Mammoth Hockey's goodwill or reputation.[76] For instance, Plaintiffs' hockey bags do not appear to be priced or designed to compete with Mammoth Hockey's high-end ones.[77] Further, Plaintiffs' use of the Mark goes well beyond selling hockey bags to include not only a wide array of goods, but also branding for a hockey team. Therefore, it would be unlikely that Plaintiffs sought to benefit from a small business's goodwill to sell goods associated with an NHL team.

Even if the court conducted a bad faith analysis under reverse confusion, Mammoth Hockey would not prevail. "A reverse confusion case is proven only if the evidence shows that the junior user was able to swamp the reputation of the senior user with a relatively much larger advertising campaign."[78] While market saturation is a mainstay of reverse-confusion cases, Mammoth Hockey has failed in its burden as the movant to prove that Plaintiffs have flooded the market. Specifically, Mammoth Hockey has provided no market-share or sales data or unrebutted evidence to support its claim that Plaintiffs have "saturated the market" of hockey-related goods with the Accused Marks.[79] At most, Mammoth Hockey offers its attorney's declaration about Google searches he ran for "mammoth hockey bags" and "mammoth hockey" that allegedly showed Plaintiffs' hockey bags and its team homepage as the top results for each, respectively.[80] Plaintiffs rebut these Google search results with their own that were conducted in three U.S.

---

[76] Opp'n 21.
[77] Mammoth Hockey's hockey bags sell for between $189 to $275, *see* Reply 9, and Plaintiffs' sell for between $83.99 to $119, *see* Griffin Decl. ¶ 37, Ex. 20. Additionally, none of Plaintiffs' bags use "MAMMOTH" alone on the bags. *See* Opp'n 27.
[78] J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. & Dec. 2025 update).
[79] Mot. 18.
[80] Griffin Decl. ¶¶ 24–25.

geographic locations and yielded Mammoth Hockey as the top result for a "mammoth hockey bags" search.[81] Moreover, Mammoth Hockey seemingly concedes in its reply that Plaintiffs have not saturated the market when it argues that "Plaintiffs' survey was performed too soon to yield reliable evidence" because "[i]n reverse confusion cases, Eveready surveys do not yield useful results until the Accused Mark has fully saturated the market."[82] By contrast, Plaintiffs provide some evidence of other "Mammoth" logos in use in the market to support their claim that they "were aware of [Mammoth Hockey], but also myriad other parties using "Mammoth" for bags and sports services, and all peaceably coexisting in the marketplace."[83] Therefore, even under Defendants' proposed formulation, the factor would not be met because Mammoth Hockey has not met its burden to prove the requisite intent.

### 3.    Evidence of Actual Confusion

"Evidence of actual confusion in the marketplace is often considered the best evidence of a likelihood of confusion."[84] Actual confusion is generally introduced through consumer surveys and direct, anecdotal evidence.[85] Here, Plaintiffs offer the first type and Mammoth Hockey offers the second type.

In the Tenth Circuit, a survey's "evidentiary value depends on the methodology and questions asked."[86] Here, Plaintiffs hired an expert to conduct a survey that showed participants either Mammoth Hockey's bags as they appear in the marketplace or ones in which "MAMMOTH" was replaced with "MASTODON." Its results showed a net confusion

---

[81] Groen Decl. ¶¶ 9–10.
[82] Reply 8.
[83] Opp'n 21, 28–29.
[84] *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014).
[85] *See id.*
[86] *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1144 (10th Cir. 2013) (citation omitted).

percentage of -.07%.[87] Mammoth Hockey challenges the methodology and claims that it surveyed the wrong customer base.[88] Both parties agree that the proper universe to survey for a reverse confusion case is the senior user's customer base.[89] The survey included participants interested in "a premium, durable hockey bag," which fits well with how Mammoth Hockey describes their bags, but then specified that the bag "costs at least $100."[90] By selecting participants willing to pay as little as $100 for a hockey bag, the survey arguably used—or at least included—Plaintiffs' customer base. Yet it stands to reason that the undisputedly "specialized audience"[91] willing to pay between $189 to $275 on a premium hockey bag would be less likely confused than prospective buyers of cheaper bags.[92]

While both parties discuss the survey, neither does so in depth. For the foregoing reasons, at this stage the court considers the survey evidence to either be relatively weak or at least of unclear strength and so affords it less weight.

For its part, Mammoth Hockey presents limited anecdotal evidence of actual confusion.[93] In its motion, it recounts two instances in the last four months in which Mr. Olson's fellow hockey enthusiasts seemed confused about whether Mammoth Hockey was affiliated with Plaintiffs. The first instance involved someone approaching Mr. Olson when he was wearing one

---

[87] Opp'n 23; Decl. of Itamar Simonson, Ex. 1 ("Simonsen Report") ¶¶ 30–32, ECF 40-1, filed Oct. 30, 2025.

[88] Reply 8–9.

[89] Simonsen Report ¶ 18; Reply 8–9.

[90] Simonsen Report, Exhibit F, Table 4.

[91] Opp'n 31; Reply 9.

[92] *See, e.g.*, *Kodiak Cakes LLC v. Continental Mills, Inc.*, 358 F. Supp. 3d 1219, 1233–34 (D. Utah 2019) (stating that inexpensive items "are more likely to be confused than expensive items, which are typically chosen carefully").

[93] Mot. 19–20. In its Reply, Mammoth Hockey cites additional examples of alleged confusion which it did not raise in its Motion. Generally, courts do not permit new arguments or evidence in reply, since they deprive the opposing party of the opportunity to respond. *See In re Motor Fuel Temperature Sales Prcs. Litig.*, 872 F.3d 1094, 1113 n.5 (10th Cir. 2017) (citing *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)). Accordingly, the court does not consider these belated examples at this time.

of his company's shirts and asking if the shirt was from Plaintiffs' hockey team.[94] The second incident occurred when Mr. Olson's teammate told him that another player had asked whether his Mammoth Hockey water bottle was from Plaintiffs' hockey team.[95] Mammoth Hockey also offers a Reddit post as evidence of confusion.[96] The post does not evince real confusion, but instead primarily holds forth on the individual's views about this lawsuit.

In the Tenth Circuit, "isolated instances of actual confusion may be de minimis."[97] This seems to be especially true if there is a lack of similarity between the competing marks.[98] Accordingly, these few, isolated instances of actual confusion are given little weight in the analysis. Taken together, the survey and direct evidence do not suggest much actual confusion.

### 4.    Similarity of Products and Manner of Marketing

"The greater the similarity between the products, the greater the likelihood of confusion."[99] Courts analyze this factor by considering the similarity of both the products themselves and the manner by which they are marketed.[100] The question is "not whether the goods and services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both."[101]

---

[94] *See* Decl. of Erik Olson in Support of Def.'s Mot. for Prelim. Inj. ("Olson Decl.") ¶ 52, ECF No. 30, filed Sept. 25, 2025.
[95] *Id.* ¶ 53.
[96] Griffin Decl., Ex. 26 at 5, ECF No. 31-26, filed Sept. 25, 2025.
[97] *Universal Money Ctrs.*, 22 F.3d at 1535 (cleaned up); *see also Water-Pik*, 726 F.3d at 1150 ("We have consistently recognized, however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis.").
[98] *See, e.g.*, *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092–93 (10th Cir. 1999); *Universal Money Ctrs.*, 22 F.3d at 1535–36.
[99] *Sally Beauty Co.*, 304 F.3d at 974.
[100] *See id.*
[101] *Instructure, Inc.*, 2022 WL 43829, at *12 (citation and quotation marks omitted).

Here, it is undisputed that both parties sell hockey-related products, including hockey bags.[102] Yet Plaintiffs primarily use the Accused Marks to sell professional hockey, making this case distinct from those in which "[l]ikelihood of confusion is obvious when two companies sell the same thing under the same name."[103] In other words, Plaintiffs use the Accused Marks to market an NHL team, which also includes selling branded hockey-related goods.[104] This service represents a material difference that undercuts similarity of products in reverse confusion cases.[105] Further, the hockey-related products themselves are seemingly different. Mammoth Hockey's bags are premium, "top shelf" products designed to be durable and priced to represent that high quality.[106] Plaintiffs' bags, however, are marketed at a lower price point for fans who want a bag for "moderate recreational and general usage."[107] Finally, Plaintiffs' hockey bags differ from Mammoth Hockey's because they do not contain "MAMMOTH" on them, unlike various bags available online from other third-party companies.[108] And, as noted above, the logos themselves look very different. Therefore, Mammoth Hockey has not shown that the products are similar enough to likely cause confusion.

In comparing the manner of marketing, the court also concludes that this factor is neutral. Granted, Plaintiffs  sell their goods in physical stores, such as the Delta Center Store, Smith's

---

[102] *See* Mot. 20; Opp'n 25.
[103] *Sec. USA Servs., LLC v. Invariant Corp.*, 1:20-cv-01100, 2023 WL 2573293, at *5 (D.N.M. 2023)*.
[104] *See* Armstrong Decl. ¶ 55.
[105] *See, e.g.*, *Harlem Wizards Enterm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1095 (D.N.J. Jan. 27, 1997) ("Meaningful differences between the products and services are often cited as a factor tending to negate reverse confusion, even when the products are superficially within the same category.").
[106] Mot. 30.
[107] Armstrong Decl. ¶ 54.
[108] Opp'n 27–30 (depicting images of bags bearing "MAMMOTH" logos from various companies, such as Mammoth Amateur Hockey Association, MammothCooler, Boji Mammoths, Mammoth Track Club, and Mammoth Mug); Armstrong Decl. ¶ 34.

Food & Drug, NHL shops, and Costco.[109] In contrast, Mammoth Hockey does not sell its goods in brick-and-mortar stores.[110] However, both parties sell hockey-related goods through online sales.[111] Given how common internet sales are, this similarity is expected. Therefore, the evidence suggests the parties' distinct manner of marketing might marginally reduce the likelihood of confusion, though the court assigns this factor little weight on this record.

### 5.    Degree of Care Likely to be Exercised by Consumers

"The greater the value of an article, the more careful the typical consumer can be expected to be."[112] Here, Mammoth Hockey's premium, high-end hockey bags are likely to be purchased by sophisticated consumers who exercise a high degree of care. Indeed, Mammoth Hockey is targeting hockey players who need durable bags, whereas Plaintiffs are targeting fans of their particular hockey team. Mammoth Hockey says little about this factor, except to argue that the Marks are "nearly identical" and that this necessarily attenuates the care a consumer might exercise.[113] But as noted earlier, the Marks are not "nearly identical." Therefore, this factor weighs against confusion.

### 6.    Strength or Weakness of the Mark

Turning to the final factor for likelihood of confusion, the court considers the strength of the mark. "The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion."[114] Courts assess the strength of a mark in two aspects: "conceptual strength, or the mark's place on the spectrum of distinctiveness; and commercial strength, or its level of

---

[109] Armstrong Decl. 22–24.
[110] Mot. 6.
[111] Mot. 20; Opp'n 26.
[112] *M Welles & Assocs., Inc. v. Edwell, Inc.*, 69 F.4th 723, 735 (10th Cir. 2023) (cleaned up).
[113] Mot. 21.
[114] *Sally Beauty Co.*, 304 F.3d at 975.

recognition in the marketplace."[115] Courts measure conceptual strength along a spectrum of distinctiveness.[116] The five categories on the spectrum, ranging from least to the most distinctive, are "generic, descriptive, suggestive, arbitrary, and fanciful."[117]

Mammoth Hockey asserts its Marks fall on the strong end of the spectrum as an "arbitrary" mark because it is "inherently distinctive."[118] In this context, "arbitrary" means "that the mark is a word or symbol already in common use that does not have any apparent relation to the product."[119] However, Mammoth Hockey states that it chose "MAMMOTH" because "it signifies strength, endurance and resilience due to the Ice Age animal's size and ability to survive harsh conditions."[120] Likewise, Plaintiffs chose "MAMMOTH," in part, because the animals "present a formidable image of strength and powerful momentum," as well as their "connection to the ice age [that] fits well with [Plaintiffs'] winter-leaning branding strategy."[121] The similar reasons that both parties chose "MAMMOTH" demonstrate the term is not arbitrary. Instead, the conceptual strength of the Marks is more accurately described as "suggestive, falling midway in the range of conceptual strength."[122]

Courts also consider how frequently a mark is used in the marketplace to determine conceptual strength.[123] "[E]xtensive third-party use of a component of a disputed term can undermine the strength of the term as a whole."[124] It is well-established in the Tenth Circuit that

---

[115] *Kodiak Cakes LLC*, 358 F. Supp. 3d at 1234 (quoting *Hornady Mfg. Co., Inc.*, 746 F.3d at 1007).
[116] *See Water Pik, Inc.*, 726 F.3d at 1152.
[117] *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1074 (10th Cir. 2023).
[118] Mot. 21.
[119] *Water Pik*, 726 F.3d at 1152.
[120] Olson Decl. ¶ 6.
[121] Armstrong Decl. ¶ 22.
[122] *Elevate Fed. Credit Union*, 67 F.4th at 1074.
[123] *Id.* at 1074–75.
[124] *Water Pik, Inc.*, 726 F.3d at 1152.

"extensive third-party use of the disputed term indicates that the term itself deserves only weak protection."[125] Here, Plaintiffs have presented evidence from a trademark research expert that many third parties use iterations of "Mammoth" to market sports teams and bags.[126] Given that, the Marks at this stage appear to have "relatively weak conceptual strength."[127]

      In terms of commercial strength, a mark's strength is evaluated "in the relevant market, which is where the alleged confusion would arise."[128] In analyzing that market, courts consider a mark's "length and manner of use," its "nature and extent of advertising," and "the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."[129]

      Mammoth Hockey asserts it has spent eleven years successfully advertising its high-end hockey bags.[130] Though it only refers to them in passing, Mammoth Hockey provides invoices for what appears to be several dozen hockey bag sales, as well as several different accessories, over the past decade that were shipped to many different states.[131] While this shows geographic and temporal diversity of its sales, the supplied invoices do not show a large sales volume.[132] Indeed, nowhere does Mammoth Hockey describe its overall sales volume or how many bags it has sold per year or by state. Mammoth Hockey also states that it has had numerous views of its YouTube channel and Facebook page, and that it has sponsored various hockey teams and

---

[125] *First Sav. Bank, FSB*, 101 F.3d at 654.
[126] Opp'n 32–33; Decl. of Frank A. Kelly in Support of Pls.' Opp'n to Def.'s Mot. for Prelim. Inj. ¶¶ 9–21 ("Kelly Decl."), ECF No. 41, filed Oct. 30, 2025.
[127] *Elevate Fed. Credit Union*, 67 F.4th at 1075.
[128] *Id.* at 1076.
[129] *Water Pik, Inc.*, 726 F.3d at 1154 (quoting *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004)).
[130] Mot. 6–7 ("Defendant's highly durable hockey bags have received excellent reviews from prominent figures in the hockey community, which have also been viewed by hundreds of thousands of people.").
[131] Olson Decl., Ex. 9.
[132] *See id.* (including invoices of approximately eighty-eight sales).

tournaments.[133] Certainly this shows some effort at advertising. But it is generally lacking in context and specifics that would allow a determination of commercial strength. It is insufficient to support a finding of commercial strength.[134] Thus, Mammoth Hockey has not met its burden on this factor, so the commercial strength weighs against likelihood of confusion.

In sum, Mammoth Hockey has succeeded in showing it has a protectable mark and Plaintiffs are using a similar mark in commerce. However, it has not shown a likelihood of confusion.[135] Therefore, Mammoth Hockey has not demonstrated that it is substantially likely to succeed in its trademark infringement claim. Accordingly, it is not entitled to the Lanham Act's presumption of irreparable injury.[136] More critically, because Mammoth Hockey did not show that it is substantially likely to succeed on its trademark infringement claim, it cannot prevail on its motion for a preliminary injunction.

## II.    Irreparable Harm

As noted above, irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction."[137] "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical."[138]

---

[133] Olson Decl. ¶¶ 38–41.

[134] See *Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, No. 2:12-CV-00936-TC-DBP, 2021 WL 364109, at *9 (D. Utah Feb. 3, 2021) (finding insufficient extensive data and huge numbers of page views and advertising expenditures without necessary context), *aff'd sub nom. Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891 (10th Cir. Sept. 7, 2023).

[135] See *Equitable Nat'l Life Ins. Co., Inc.*, 434 F. Supp. 3d at 1239–40 (quoting *Beltronics USA, Inc.*, 562 F.3d at 1071).

[136] See 15 U.S.C. § 1116(a).

[137] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004); *see also* 11A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 2948 (3d ed & Sept. 2025 update) ("The Second and Tenth Circuits have stated that the irreparable harm requirement must be satisfied before the other factors may be considered.") (citing *State v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021)).

[138] *Schrier*, 427 F.3d at 1267 (internal quotation marks and citations omitted).

Additionally, "a party requesting a preliminary injunction must generally show reasonable diligence."[139] "As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury."[140] An "unnecessary and unexplained delay in seeking equitable relief undermines [Plaintiffs'] claim that they will suffer irreparable harm but for expedited preliminary relief."[141] "However, delay is but one factor in the irreparable harm analysis."[142] "The question instead is whether the delay was reasonable, was not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party."[143]

Plaintiffs argue that Mammoth Hockey's delay was unreasonable because it knew on June 7, 2024 that UTAH MAMMOTH was under consideration as Plaintiffs' team name, yet it waited to object until June 10, 2025, when Mammoth Hockey sent Plaintiffs a cease-and-desist letter.[144] Plaintiffs also argue that Mammoth Hockey's "year-long delay" resulted in "extreme prejudice" because Plaintiffs have invested millions in the last year launching their team as the newest member of the NHL.[145]

---

[139] *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).

[140] *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (quoting *New Jersey Ass'n of Health Care Facilities, Inc. v. Gibbs*, 838 F. Supp. 881, 928 (D.N.J. 1993)).

[141] *Are You Listening Yet Pac v. Henderson*, No. 2:24-cv-00104, 2024 WL 1051984, at *10 (D. Utah 2024) (waiting to seek injunctive relief until one week prior to signature gathering deadline was an "unnecessary and unexplained delay"); *see also Schiermeyer ex rel. Blockchain Game Partners, Inc. v. Thurston*, 697 F. Supp. 3d 1265, 1270 (D. Utah 2023) (two year delay in seeking injunctive relief undercut plaintiff's argument that "he urgently needs that relief to avoid a likely, imminent, and irreparable harm.").

[142] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (citing *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984)) (eight year delay in seeking injunctive relief for trademark infringement showed lack of irreparable harm); (also citing *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1221 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005) ("Plaintiffs' delay in seeking an injunction undermines their argument that they will suffer irreparable harm if an injunction does not issue.").

[143] *Fish*, 840 F.3d at 753 (citing *RoDa Drilling Co.*, 552 F.3d at 1211–12).

[144] Opp'n 12–15.

[145] *Id.* 16–17.

Mammoth Hockey responds that Plaintiffs cannot raise a laches argument because of their "unclean hands" in concealing their intent to infringe.[146] Moreover, Mammoth Hockey argues that the speed it took in bringing this action was reasonable because it did not learn of the infringement until May 7, 2025 and had to find trademark attorneys.[147]

Based on these facts, it does not seem that the delay by Mammoth Hockey was so unreasonable that the court should not consider the merits of its motion. The Tenth Circuit has held that a "three-month delay in filing did not defeat a claim of irreparable injury when the delay was attributable to plaintiff's attempts to negotiate and the need for further documentation of the harm."[148] Mammoth Hockey clearly knew about the possibility of Plaintiffs using "UTAH MAMMOTH" in April 2024. As noted earlier, Mammoth Hockey's co-founder texted Plaintiffs acknowledging that that "the Utah Hockey Club [might] end[] up being the Mammoth next season." However, Mammoth Hockey certainly hoped for and may have anticipated discussions about a possible partnership and arguably was reassured in that belief as late as April 2025.[149] When it became clear that Plaintiffs had no intention of partnering with Mammoth Hockey, it acted relatively swiftly in issuing its June 2025 cease-and-desist later. It is true that it did not then file its motion for preliminary injunction until September 2025. This pace did not suggest tremendous urgency, but it is not unduly slow on this record. Moreover, any delay on Mammoth Hockey's part in seeking injunctive relief is not dispositive.[150] Accordingly, the court turns to

---

[146] Reply 4.
[147] *Id.* 5.
[148] *RoDa Drilling Co.*, 552 F.3d at 1211.
[149] Mot. 8–9.
[150] *See id.*

Mammoth Hockey's arguments on how it will be irreparably harmed by continued use of the Accused Marks.

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."[151] This is "not an easy burden to fulfill"[152] and the movant "must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages."[153] "Purely speculative harm will not suffice."[154] "In trademark infringement cases, grounds for finding irreparable harm include loss of control of reputation, loss of trade, and loss of goodwill."[155]

Mammoth Hockey largely relies on the presumption of irreparable harm that accompanies a likelihood of success for trademark infringement.[156] However, Mammoth Hockey also alleges that Plaintiffs' saturation of the market with merchandise bearing the Accused Marks has harmed the goodwill and reputation for high quality hockey goods that it has built over the past eleven years.[157] As support, Mammoth Hockey points to a few instances of actual confusion among consumers and to Google searches for "mammoth hockey bags" that now pull up Plaintiffs' hockey bags as the first result.[158] Of course, standing alone, the fact that a particular search shows results both from the Plaintiffs and the Defendant does not itself show confusion.

---

[151] *First W. Cap. Mgmt. Co.*, 874 F.3d at 1141 (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)).
[152] *DTC Energy Grp., Inc.*, 912 F.3d at 1270 (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).
[153] *Id.* (quoting *First W. Cap. Mgmt. Co.*, 874 F.3d at 1141).
[154] *RoDa Drilling Co.*, 552 F.3d at 1210.
[155] *Blendtec Inc.*, 2025 WL 2661555, at *10.
[156] Mot. 24.
[157] *Id.*
[158] Mot. 10, 19–20, Griffin Decl. ¶¶ 24–25.

"Although loss of good will and harm to market position are factors that can demonstrate irreparable harm, ultimately '[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."[159] Mammoth Hockey does not allege facts showing that its customer relationships have been harmed or otherwise establish how Plaintiffs' alleged actions have harmed its goodwill and market position. Plaintiffs challenge Mammoth Hockey's Google searches with their own, conducted "in three different U.S. geographic locations" in September and in October.[160] They allege that the results show that Mammoth Hockey's website "almost always appears first" under a search for "mammoth hockey bags."[161] Mammoth Hockey's disputed evidence and speculations about future harm do not sufficiently establish the "certain, great, actual and not theoretical" injury necessary to satisfy this element.[162] Therefore, Mammoth Hockey has not established that it likely will be irreparably harmed if Plaintiffs are not enjoined from use of the Accused Marks.

Because Mammoth Hockey has not shown either that it is substantially likely to succeed on the merits or that it will suffer irreparable injury if its motion is denied, the court does not consider the balance of harms or public interest factors.

In sum, Mammoth Hockey has not met its burden to obtain a preliminary injunction of any and all use of the Accused Marks.

---

[159] *Red Cat Holdings, Inc., v. Matus*, No. 2:25-cv-00646, 2025 WL 3079176, at *5 (D. Utah Nov. 4, 2025) (quoting *Dominion Video Satellite*, 269 F.3d at 1156).

[160] Groen Decl. ¶ 9, Ex. 6.

[161] *Id.*

[162] *Schrier*, 427 F.3d at 1267 (internal quotation marks and citations omitted); *see also Dominion Video Satellite*, 356 F.3d *v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004) ("In defining the contours of irreparable harm, case law indicates that the injury 'must be both certain and great, and that it must not be merely serious or substantial.'") (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).

## ORDER

Accordingly, Mammoth Hockey's Motion for Preliminary Injunction is DENIED.[163]

Signed December 23, 2025.

BY THE COURT

_____

David Barlow
United States District Judge

---

[163] ECF No. 29.